LEWIS H. YOUNG *v.* HOME LIFE INSURANCE COMPANY

(No. 7872)

Submitted March 6, 1934. Decided March 20, 1934.

*Payne, Minor & Ray* and *J. F. Bouchelle,* for plaintiff in error.

*E. E. Robertson* and *Lillian S. Robertson,* for defendant in error.

WOODS, PRESIDENT:

Lewis H. Young recovered a judgment against the Home Life Insurance Company in the sum of $300.00, which represents disability benefits for the period March 20th to September 20th, 1932. This judgment is challenged on two grounds, namely, that the disability benefit is unenforceable because of fraud in its procurement; and, that the verdict is contrary to the law and the evidence.

On December 5, 1929, an agent of defendant company took plaintiff's application for a $5,000.00 life contract, with "disability" and "additional death" benefits. And, on December 16, 1929, a policy, No. 373,419, in the sum of $5,000.00 was issued, the provisions relating to the special benefits being upon separate detached printed forms, which were duly authenticated by the company.

Plaintiff's action is based on the theory that the "disability" feature is, in fact, part and parcel of the life contract, and that the one year incontestability provision in the latter applies with equal force to it. And that by reason thereof the defendant was precluded from raising the question of fraud in procurement after December 16, 1930. Richard's Ins. Law (3d Ed.), sec. 378; 2 Joyce on Ins. (2d Ed.), sec. 8949.

The application was primarily one for life insurance, with blanks in which to indicate by the insertion of an "x" if either, or both, of the special benefits were desired. Each of the special benefit agreements, or riders, refer in their opening paragraph to the life policy, the one declared on reading: "Agreement for total and permanent disability benefit issued in connection with and attached to policy No. 373,419, dated December 16, 1929, on the life of Lewis H. Young"; and the corresponding paragraph in the "additional death benefit" likewise recites that it is "issued in connection with and attached to", etc. The amount recoverable under either of the

special features is dependent upon the amount of insurance in the life contract. If there is any question in regard to the meaning of the words "issued in connection with and attached to", when read in connection with the application and the life policy, that construction should be adopted which favors the insured. It would be just as reasonable to deny liability under the "additional death benefit" feature on the ground that the contract was procured by fraud, as to advance such defense in this case. In view of the fact that the "additional death benefit" was taken out at the time of the life policy, and but one application required, we feel that the incontestability feature must apply with like force to both. And, so construing the words heretofore used in one of the special features, a like construction must be placed on the same words used in the "disability" benefit feature.

Being of the opinion that the incontestability clause applies to the disability feature, and it appearing that the one year provided in such clause had elapsed long before the company sought to avail itself of such defense, we need not go into the question of fraud in the procurement of the insurance. *Morris* v. *Missouri State L. Ins. Co.*, (W. Va.) 171 S. E. 740.

Is the evidence sufficient to support a verdict for the plaintiff for the period March 20th to September 20th, 1932?

It is the contention of the plaintiff that he is suffering with traumatic neurosis, and that, with the exception of a six weeks' period in October and November, 1931, when he acted as timekeeper for Venable & Farkas, road contractors, he has been unable to perform any kind of labor for any appreciable period of time, without suffering ill effects therefrom, since the date of his injury, to-wit, March 26, 1929.

The company defended on the theory that plaintiff was a malingerer. And in support thereof called, as witnesses, several neurologists and physicians, who had examined plaintiff prior to September 20, 1932. Each testified in effect that he had failed to discover any physical condition which would render plaintiff incapable of performing manual labor, and that he had found no symptoms of sufficient moment to warrant a diagnosis of traumatic neurosis. The neurologists divided the symptoms of traumatic neurosis into two classes. Those ascertainable only through the statement of the patient,

such as the presence of dizziness and headache, were placed in the subjective class; and those open to observation through physical examination and mental tests, in the objective. Excessive sweating, evidenced by cold and clammy hands and feet and tremors of body, fingers, arms and legs, were cited as examples of objective symptoms.

It is admitted that the plaintiff, on March 26, 1929, while engaged in "dumping a truck", was caught under the arm and thrown some twelve feet, lighting on his neck and shoulder on the frozen ground. It appears that he consulted a physician the following day, and within the course of two or three weeks was referred to Dr. E. Bennett Henson with a note from his employer. Dr. Henson upon his initial examination found Young suffering from a "kyphosis" and a "swelling of the muscles" on the left side, and had him put to bed, and later in a cast. As indicated by reports made to the defendant company on June 30th, August 18th, and October 11, 1930, Dr. Henson thought that plaintiff's recovery would be rapid and that he would be able to return to work within a short time. And the company, acting on such information, paid disability benefits for the period July, 1930, to January, 1931.

But Young, according to evidence submitted on his behalf, did not recover as anticipated. Dr. Henson called Dr. Easley, one of the neurologists who testified on behalf of the defendant, for consultation on the case, the latter making his examinations in January and March of 1931. Dr. Henson testified that as a result of such examinations plaintiff's condition was diagnosed as traumatic neurosis. Dr. Easley, however, denied any concurrence in such a diagnosis, as our reference to defendant's evidence indicates. Dr. Henson further stated that in his opinion plaintiff would never be any better. Dr. Roberts, who made examinations and rendered medical services during the latter part of the period for which disability is now claimed, stated that in his opinion plaintiff was suffering from traumatic neurosis. This diagnosis was based on plaintiff's statements concerning his condition, and such objective symptoms as excessive perspiration accompanied by a more or less clammy condition of the skin, especially of the hands and feet, and tremors in the hands. It was also shown by lay witnesses, including former employees, that

720

plaintiff, prior to injury, had been a good worker, and apparently enjoyed good health.

In view of the foregoing the Court is of opinion that there is appreciable evidence to the effect that the plaintiff was suffering from traumatic neurosis, and that the question of the existence or non-existence of such condition was one for the jury to decide.

The jury are the judges of the credibility of the witnesses and weight of evidence, and usually, when a prima facie case has been made out by the plaintiff, as here, the question as to whether it has been rebutted is for the jury. *Ross* v. *Gill,* 1 Wash. 87; *McDowell's Ex'r.* v. *Crawford,* 11 Gratt. 377; *State* v. *Thompson,* 21 W. Va. 741.

Perceiving no prejudicial error, we must affirm the judgment.

*Affirmed.*