No. 33,109

JOHN W. CORR, JOHN B. BRYANT, E. O. BOGGS, J. ARCH BUTTS, EARNEST A. DROLLINGER, WILLIAM R. PIPER; W. L. HARTMAN, CLAUDE R. LAMBE, PAULINE M. LAMBE, GEORGE LAVENDER, O. O. LAVENDER, CHARLES B. MOORE, Executor, and THE SYNDICATE OIL CORPORATION, *Appellees,* v. THE CONTINENTAL OIL COMPANY and THE GYPSY OIL COMPANY, *Appellants.*

(64 P. 2d 30)

Opinion filed January 23, 1937.

*Claude I. Depew, W. E. Stanley, Sidney J. Brick* and *Eugene G. Coombs,* all of Wichita, for the appellants; *William H. Zwick, A. L. Hull,* both of Ponca City, Okla., and *Russell G. Lowe,* of Tulsa, Okla., of counsel.

*Austin M. Cowan* and *H. F. Hudson,* both of Wichita, for the appellees.

The opinion of the court was delivered by

SMITH, J.: This was an action for damages for draining the oil from under a lease on which plaintiffs owned the royalty interest. The case was tried and the issues of fact were submitted to a jury. The jury failed to agree and was discharged. Defendants appeal from an order overruling a demurrer to the evidence of plaintiffs.

The action arose in the Valley Center oil field. The lease of which plaintiffs owned the royalty interest is known as the "Lambe 80." The defendants owned the lease upon this tract as well as the adjoining tracts to the north and east.

The lease was given May 5, 1927, for a term of five years from that date or as long thereafter as oil or gas should be produced therefrom. The lease provided that if operations for the drilling of a well were not commenced on the land within one year from the date of the lease, it should terminate unless the lessees should on or before one year from that date pay to lessors the sum of $1 per acre. The clause in the lease covering this point is as follows:

"Shall operate as rental and cover the privilege of deferring the commencement of drilling operations for a period of one year. In like manner and upon like payments or tender, the commencement of drilling operations may be further deferred for like periods successively during the original term of this lease."

It was admitted at the trial of the case that all rentals provided for in the lease covering the privilege of postponing drilling operations for the years 1928, 1929, 1930 and 1931 had been paid and accepted by the lessors.

A well was drilled on the "Lambe 80" before the expiration of the five-year period. It came in with a daily production of 126 barrels of oil and later dropped to 64 barrels with a great deal of water.

It was also agreed at the time of the trial that at no time was any demand made upon defendants by plaintiffs for the drilling of any well to protect against drainage.

The petition alleged the discovery of the Wright pool by the drilling of a well about a half mile east of the "Lambe 80" and that this well came in with an initial production of seventeen hundred barrels of oil a day; that this pool was of a continuous and uniform shape, and covered a well-defined oil-bearing strata which was of an open, porous, continuous and uniform type, which permitted the free and unrestricted accumulation, migration and drainage of oil in any direction; and that the "Lambe 80" was located higher on the geological strata than any other land over the pool, and in the most favorable position for the accumulation of oil; and that the oil-bearing formation under the "Lambe 80" was of the same grade and had the same characteristics. The petition further alleged that the pool had produced 16,000 barrels of oil per acre and there was that amount of oil under the "Lambe 80" when the field was discovered.

The petition then alleged the drilling of various wells in the neighborhood of the "Lambe 80" during 1929 and 1930, but that defendants waited until January 8, 1932, before commencing to drill the only well that was drilled on the "Lambe 80," and this well was the last well to be drilled into the main Wright pool, and it was not sufficient and was drilled too late to prevent drainage of oil from the "Lambe 80."

The petition then alleged that about October 1, 1929, the oil began to be drained from the "Lambe 80"; that defendants owned

the leases on all lands adjoining the "Lambe 80" and owned and controlled the wells that were drilled thereon, and as the oil was drained from the "Lambe 80" it was caught and recovered from defendants' oil wells and marketed by them; and that plaintiffs never received any remuneration from defendants for their royalty share of the oil so recovered; and that the amount of oil drained from beneath the "Lambe 80" from about October 1, 1929, to the date of the filing of this petition amounted to about 640,000 barrels and amounted to $108,000 in value.

The petition then alleged that defendants knew the shape of the geological structure beneath the lease in question and knew that the "Lambe 80" was better located structurally than any other tract of ground over the pool, and knew with reasonable certainty that this "Lambe 80" would have as many barrels of oil beneath each acre as would be beneath each acre of any other tract, but that defendants did not disclose any of this information to plaintiffs; that defendants knew at all times that oil was being drained from beneath the "Lambe 80" and that defendants deliberately planned that they would drain the oil from beneath the "Lambe 80" to save the cost of drilling seven additional wells thereon.

Judgment was asked in the amount of $108,000.

The answer of defendants was first a general denial. The answer then alleged the payment of the delay rentals and that during all the time in question no demand was made by plaintiffs upon defendants for the drilling of a well on the "Lambe 80" or for a development of the lease, and that for that reason plaintiffs were estopped from claiming any damage by reason of the failure of the defendants to commence drilling operations upon the "Lambe 80."

The reply was a general denial, and especially that the acceptance of delayed rentals or failure to demand the drilling of a well operated as estoppel of plaintiffs.

It will be seen that two facts are undisputed. First, plaintiffs did accept delayed rentals—and second, plaintiffs did not demand that defendants drill wells on the "Lambe 80." Defendants argue that since these two facts appeared from the evidence of plaintiffs, either one of them would require that the demurrer of defendants to the evidence of plaintiffs should be sustained.

The third question argued by defendants is that there was no competent evidence that there had been drainage or that these plaintiffs had been damaged, the evidence submitted being based

upon no facts, being entirely conjectural and too remote and specu-lative to afford any proper measure.

On account of the conclusion we have reached as to the third ground for the demurrer it will not be necessary for us to consider the first two questions.

We shall proceed to a consideration of the question of whether the evidence offered by plaintiffs to prove that oil was drained from their lease and the amount of drainage was so remote, speculative and conjectural as not to afford any proper measure of damages. This necessitates an examination of the evidence offered by plaintiffs. They depended in the main upon two experts to establish the facts upon which they depend.

The first expert qualified by testifying that he had a master's degree from the University of Pittsburg and had worked as a practical geologist in various fields. His work was with operators to determine where wells should be located, and the structural operations in various parts. He testified that he had studied the logs of the wells in the Valley Center oil field. He further testified that the oil-bearing structure in the Valley Center field was dolomite, a type of limestone; that where this formation produces oil it is porous enough to be a reservoir for oil and that the porosity of limestone runs all the way from four to thirty percent. He testified that the structure of the Valley Center field constitutes an interruption in the natural dip, which might be crudely illustrated as an inverted bowl, and that the theory of the accumulation of oil is that oil migrates up inclines in conjunction with gas and water, gas rising to the top, being lighter, oil coming next, being heavier than gas and lighter than water, with the water on the bottom, forcing the oil up, and that as particles of oil and gas are liberated they move up this incline until they find a fault in the structure and then are trapped underneath.

A map made by this witness was then introduced in evidence and was before this court when the appeal was argued. This map shows the location of the various wells in the field and also shows by means of contour lines the depth of various parts of the oil-producing structure below sea level. This map shows that the highest point in this field is located on the "Lambe 80" with a low place to the northeast and then another high point on the north part of the quarter section immediately north of the "Lambe 80." The structure underneath the balance of the field is from ten to twenty

feet lower than these two points. At this point the witness testified that in his opinion there had been oil underneath the "Lambe 80." The witness then identified certain wells that had been drilled on leases adjoining the "Lambe 80" on the north and east. He further testified that in his opinion oil drained from the "Lambe 80" off the north end into the Corr lease and the Reed lease and the Wilson lease. These leases adjoin the "Lambe 80" at the northeast corner.

The witness then identified a statement of the oil and water produced by every individual well in the Valley Center field. After some cross-examination this exhibit was admitted. The witness then testified that in his opinion the amount of oil accumulated under the "Lambe 80" in its virgin state before any oil was taken from the field was approximately 12,500 barrels per acre or approximately 1,360,000 barrels, and that this opinion was based on the average recovery per acre over the entire field. He further testified that drainage of oil from under the "Lambe 80" began after completion of the wells on the Corr lease about May 30, 1929. In conclusion he testified that the value of the oil drained from the "Lambe 80" at $1.20 a barrel from October 1, 1929, to August 30, 1934, was $1,632,000 and that one eighth of this would be $204,000. It will be noted that this witness took the entire production of the Valley Center field, divided that by the number of acres in the field, and then multiplied this by 80 to get the amount of oil underneath the "Lambe 80."

In order to test the reliability of this rule we must examine the statements made by the witness on cross-examination, together with what knowledge we share with all mankind about the oil business.

The particular formation underneath the surface of the earth in which the oil for the Valley Center field is found is of siliceous limestone. It outcrops in the Arbuckle Mountains to the south, in the Ozarks to the east and in the Black Hills to the north. It disappears completely to the west in central Kansas. It is not loose but is porous enough to be a reservoir for oil. The action of chemicals and other agencies under the surface of the earth has caused this porous condition. The water, oil and gas are constantly on the move in a formation of this type. The gas is on top, then the oil and then the water. The formation permits this circulation quite freely until a disturbance of some sort is reached in the formation and then the oil migrates upward as far as it can and finally through

the years accumulates. This forms what oil men call a pool. For this reason wells are often drilled into what appears to be the high point in the structure.

This witness testified that where oil-bearing limestone had a low degree of porosity it would not contain much oil as compared with rock that has a high porosity. Where the holes are large the oil would move faster than where they are small. The movement of the oil in this field is caused by the pressure of water which oil men call the hydrostatic head and by the presence of gas that is dissolved in the oil. This witness did not know what the hydrostatic pressure in this field was nor whether there was pressure from gas in this field. The witness had never measured the porosity nor the permeability of the limestone in this field. He testified that the porosity and permeability are the factors that determine the movement of oil through a formation. He did not know what the porosity or permeability of the formation was under the "Lambe 80." It is conceded in this record that the same thing happened in this field that we know generally happens in oil fields, that is, wells are drilled at a certain place and turn out to be good producers, while a well is drilled a short distance away and turns out to be a dry hole. This happened in the Valley Center field in a number of instances. At this point it should be noted that while the formation is high at the southeast corner of the "Lambe 80" it slopes away rapidly to the west and a little less sharply to the north. The formation to the east is a far more gradual slope except that there is a point on the Corr and Reed leases that is about as high as the high point on the "Lambe 80."

The second expert testified to substantially the same effect as the first expert except that he calculated that there were about 30,000 barrels of oil left under the "Lambe 80." He testified that the royalty interest in the oil drained was worth $128,900. His main point was that when the well was drilled on the "Lambe 80" the water table was encountered at a depth of 1,992 feet and in another lease where a well was drilled several years prior to that the water table was encountered some 30 feet lower down. He reasoned that this showed a draining away of the oil so as to permit the water to rise in the structure. His testimony as to the porosity and permeability of the structure was about the same as that of the other expert. The burden assumed by plaintiffs was two-fold. They had to prove that there had been oil under the "Lambe 80" when drilling first started

in the field and they had to prove that this oil had been drained away through the wells of defendants. It will be noted that there is but little dispute as to the basic facts. The witnesses knew how much oil had been taken from the various wells in the field. There is substantially no dispute as to the depth of the oil-bearing formation at various places and there is no dispute as to the general nature of this formation. It cannot be said that there was any dispute about the porosity and permeability of the structure. The fact is there was no evidence at all as to these two elements. The same may be said of the hydrostatic head and the presence of gas. The porosity and permeability are important for two reasons: first, the porosity determines how much oil there is in a particular portion of a structure, and second, porosity and permeability determine to a large extent how readily oil will drain away from one part of a structure to another. The same may be said as to the hydrostatic head and the presence of gas, although not quite to such a marked degree. These elements become all the more important when we examine the map and see that quite evidently the "Lambe 80" is located on the extreme western edge of the field. In order for the formula used by the experts in this case to be sound one must assume or prove that the content of oil underneath the whole Valley Center field before any drilling was done was uniform.

The witnesses relied on in this case by plaintiffs admitted that they did not know and had not taken into consideration these important elements without knowledge of which they were unable to fairly testify as to the questions in issue.

Plaintiffs rely on what was said by this court in *Wheeland v. Gas Co.*, 92 Kan. 50, 139 Pac. 1010. What that opinion holds is that the evidence in that particular record was sufficient to establish drainage. It is not an authority for holding that an estimate of an expert who is not in possession of essential knowledge is sufficient to establish drainage. The same may be said of *Howerton v. Gas Co.*, 81 Kan. 553, 106 Pac. 47, opinion on rehearing, 82 Kan. 367, 108 Pac. 813.

In *Steel v. Development Co.*, 80 W. Va. 206, 92 S. E. 410, the court considered a case where a lessor sued to recover damages because of the failure of the lessees to drill oil wells on lands of plaintiffs so as to prevent wells drilled on adjacent lands from draining the oil from plaintiffs' lands. The question of fact to be determined was analogous to the one we have here. Three experts testified that

in their judgment a well should have been drilled. The court examined their testimony, however, and concluded that inasmuch as certain elements were not considered by them just as certain elements were not considered by the experts in this case, their evidence was not sufficient to establish the plaintiffs' case. The court quotes from the syllabus in *Grass v. Development Co.*, 75 W. Va. 719, 84 S. E. 750, as follows:

" 'Among such circumstances and conditions are the situation of the parties; the character of the mineral products; the nature of the oil-bearing sand, whether dense or soft and porous; developments on contiguous lands, whether by same or different operators; cost of drilling; proximity to market, and facilities for marketing; current prices, whether high or low; location of the lands, and such other conditions attendant upon the operations as may explain necessity for prompt, or excuse for delayed, action in prosecuting such developments.' " (p. 215.)

*Kleppner v. Lemon, Appellant*, 176 Pa. 502, 35 Atl. 109, was an action in equity to compel defendant to put down oil wells. The question of fact was similar to the one we have here. The statement in the opinion with which we are concerned is that the porosity of the limestone formation where the particular wells in question were drilled and contemplated should be considered when the question of the existence of oil under certain land was at issue. See, also, *State Line Oil & Gas Co. v. Thomas*, (Tex. Civ. App.) 35 S. W. 2d 746.

The case of *Indiana Oil, Gas & Development Co. v. McCrory et al.*, 42 Okla. 136, 140 Pac. 610, was an action to cancel an oil and gas lease and for damages for loss of royalties. The trial court gave judgment for plaintiff for damages, but on appeal the supreme court held that the evidence was not sufficient to support the judgment. The court said:

"The rules by which these damages were estimated were so indefinite and uncertain as to amount at most to a mere guess. The production from the wells on the lease in controversy, as well as that from the wells on the adjoining land, was unequal and variant. Well No. 1 came in with an initial flow of 1,200 barrels, No. 2 with 800 barrels, and No. 3 with 175 barrels, and No. 4 with little or nothing. The wells were all drilled into the same sand, and were located on the same 40 acres, and only a few hundred feet apart, and yet their production was so variant that it seems little less than absurd for a court to solemnly adjudicate that, for careless and negligent drilling and operating these wells, the landowner had been damaged $4,000 in loss of royalties and an additional $4,000 in damages to the land itself."

We have examined the record in this case and have reached the

conclusion that the plaintiffs did not sustain their burden by proving that there was oil under the ".'Lambe 80" when drilling in the Valley Center field first started or that oil was drained from under the "Lambe 80" through wells operated by defendants. The evidence relied on to prove these issues was so speculative as to amount to but little more than guess work. It follows that the judgment of the trial court overruling the demurrer of defendants to the evidence was erroneous.

The judgment of the trial court is reversed with directions to sustain the demurrer of defendants to the evidence of plaintiffs.

HUTCHISON, J., not sitting.