HAZEL J. MITCHELL *v.* METROPOLITAN LIFE INSURANCE
COMPANY

(No. 9289)

Submitted January 20, 1942. Decided February 17, 1942.

Fox, PRESIDENT, dissenting in part.

*Brown, Jackson & Knight,* for plaintiff in error.
*Kay, Casto & Amos,* for defendant in error.

LOVINS, JUDGE:

Hazel J. Mitchell brought an action of debt in the Court of Common Pleas of Kanawha County against the defendant Insurance Company, based upon the double indemnity provision of a life insurance policy issued to her husband, Jeter C. Mitchell, and in which she is the named beneficiary. The declaration alleged that Mitchell's life was insured against accidental death by the terms of the policy and that he was accidently killed on August 8, 1940, while in the employ of the E. I. du Pont de Nemours and Company. The defendant company has paid to the plaintiff the amount due on the face of the policy, but denies liability for double indemnity. The policy provides for the payment of double indemnity "upon receipt * * * of due proof of the death of the insured, as the result, directly or independently of all other causes, of bodily injuries sustained through external, violent and accidental means * * *." The defense interposed by pleas filed was that death did not result from bodily injuries sustained through external, violent and accidental means, and that death was caused wholly or partially by disease. Judgment was entered by the trial court upon a jury verdict for the full amount sued for, and this writ of error and supersedeas is prosecuted to the action of the Circuit Court of Kanawha County in affirming that judgment as plainly right.

The deceased was employed as a catalyst mechanic by the du Pont Company at its plant at Belle, West Virginia. (A catalyst machine is described in the record as a "contact converter" or a high pressure vessel where through combinations of pressure and temperature a chemical reaction is made.) His duties were to maintain a chemical high pressure on high temperature chemical vessels, service them and replace the catalyst and take care of all the repair work in that part of the plant where synthesis was done. The foreman in charge of decedent's work testified that such machines occasionally gave off gases and fumes and that conditions thereabout that exist at one period of the day may not be similar a few minutes afterward.

On the morning of August 8, 1940, Mitchell reported to his immediate superior, Gilly Sovilla, at eight o'clock and was assigned to repair a gasket seat that was corroded and leaking at the top of a vessel about three stories high in the contact conversion area. Fifteen minutes later, Sovilla went to the place where the repairs were to be made but Mitchell and his helper, Kermit Hill, were not there, having left their tools and gone to the machine shop for materials with which to do the work. Finding them at the shop, Sovilla said he warned Mitchell of "the condition that was up there, which he was pretty familiar with." Sovilla describes this "condition" as "the heat—the heat and gas and the condition in that area," and further, "* * * the condition is always unusual because there is sudden changes take place in that area". When Sovilla returned to the scene of the repairs at about 8:45 Hill told him that Mitchell was ill and had gone to the plant hospital, whereupon, because of a plant rule prohibiting an employee from working by himself in that area (because, Sovilla says, of the possibility of a man being overcome by gas or heat), Sovilla told Hill to leave the area.

Sovilla testified that the temperature around such machines is over one hundred degrees in the summer—sometimes hotter than others due to the way the equipment operates, and that there is always work going on around the machines. There were four of the vessels, or machines in the building, and the one on which Mitchell worked was not operating and "planked off" at the time, although the one adjoining was operating and threw off some heat.

Hill testified that he had never worked with Mitchell prior to August 8, 1938, and on that occasion, as Mitchell's apprentice—or helper—was at his side from the beginning of the work until he went to the plant hospital. The top of the vessel, which was open, is cylindrical, extends through the floor or grillwork around it near the top, about three feet and is about four feet in diameter. Hill says that after they returned from the machine shop, Mitchell began the repair work, with one knee on the floor, bending over the vessel, his head over the open top,

and using hammer and chisel. About fifteen or twenty minutes later, Mitchell said he was getting sick, and sat down for about five minutes. He then made his way to the plant hospital without assistance from Hill. Hill stated that he was not bothered by the heat, however, he says that he merely stood beside the vessel and watched Mitchell work, in contrast to the latter's stooped position over the open top thereof. Hill further stated that it is hotter at that particular point than any place else in the building due to the combined factors of the proximity of three other machines of the same type, which are operated with steam, and the top of the vessel being up against the roof, three stories from the main floor.

When he reached the plant hospital, Mitchell complained, to the physician in charge, of dizziness and weakness and of pains, not severe, extending through the chest down into the arms. His blood pressure and pulse were normal, his temperature subnormal. When fluids by the mouth, the proper treatment for heat exhaustion as stated by the attending physician, were given, Mitchell became nauseated and vomited; he was then given "a stimulant" and hot water bottles and blankets were applied.

One of the plant physicians then took Mitchell to a hospital in Charleston, where he was admitted at 10:40 A. M. He was given one thousand cc. of normal saline solution and expired one hour later. The hospital's "abstract of clinical history" shows that his complaint upon admission was "generalized aching; bilateral upper chest pain."

An autopsy was performed the same day, the report of which states that death from disease is ruled out by the detailed gross and microscopic examination. Edema of the brain was found, which, according to medical evidence in the record, may be caused by excessive heat. The report concludes that the positive findings of the autopsy are occasionally encountered in heat prostration, but no characteristic findings appear upon which to base a diagnosis of death from heat prostration, without knowledge of the clinical history.

The certificate of the death of Mitchell in the State Division of Vital Statistics, signed by the physician who accompanied him to the Charleston hospital, lists "heat exhaustion" as the principal cause of death, and in answer to the question therein, "Was disease or injury in any way related to occupation of deceased", it is there stated: "Yes—working in temp. of 95 degrees."

The record shows that Mitchell had worked at the Belle plant about eight years, most of the time around the catalyst machines. Such work, according to Sovilla, was intermittent, sometimes being for two or three days straight, followed by a lapse of two or three weeks, then possibly a resumption thereof for a few hours or a full day; he further testified that Mitchell was required to report to him for work every day and that he knew of no ill effects suffered by Mitchell from his work prior to the fatal occurrence. There was no evidence of any other fatality resulting from work around the machines.

Defendant contends that heat exhaustion (sunstroke or heatstroke) is a disease, not an injury, and therefore not covered by the terms of the policy in question, which exclude self-destruction, disease and bodily or mental infirmity from the hazards covered by the double indemnity provision. This is the technical or scientific view of the meaning of the term, as indicated by the authorities cited in counsel's brief; Encyclopedia Britannica, Encyclopedia Americana, The World Book and Webster's New International Dictionary. It is argued that the average person in buying a policy like that under consideration has in mind something violent and overpowering—something like an automobile accident, a train wreck or a gunshot wound and that if the question arose in the negotiations for the sale of the policy, the parties would probably consult a standard dictionary or encyclopedia for the meaning of "sunstroke". Such a conclusion, obviously conjectural, has little or no bearing on this point. Some cases on this point have applied the scientific interpretation. See *Sinclair* v. *Maritime Pass. Assur. Co.*, 121 Eng. Reprint 521; *Dozier* v. *Fidelity & Cas. Co.*, 46 Fed. 446, 13 L. R. A. 114. We believe, however, that the better view

is expressed in authorities holding otherwise. In the first place, "the terms used in an accident insurance policy should be understood in their plain, ordinary, and popular sense, rather than in a philosophical or scientific sense." 1 C. J. 417, Sec. 44; *Kane* v. *Order Com. Travelers,* 3 Wash. 2d 355, 100 Pac. 2d 1036; *Lewis* v. *Ocean Acc. & Guar. Corp.,* 224 N. Y. 18, 120 N. E. 56, 7 A. L. R. 1129. In *Thompson* v. *Ins. Co.,* 122 W. Va. 551, 11 S. E. 2d 849, 850, this Court stated, "* * * the test is what a reasonable person in insured's position would have understood the words of the policy to mean." It would seem to us that heat exhaustion or sunstroke in its popular sense is a bodily injury or an accident, rather than a disease. As stated in *Bryant* v. *Casualty Co.,* 107 Tex. 582, 182 S. W. 673, L. R. A. 1916E, 945, Ann. Cas. 1918A, 517: "There have been certain decisions which announce that sunstroke is a disease. * * * But whatever it may be, technically, it is not regarded as a disease in the popular mind. In the common understanding it is accounted a kind of violent personal injury, from the very idea of sudden and external force carried by the word." See also *Lower* v. *Met. Life Ins. Co.,* 111 N. J. L. 426, 168 A. 592; *Cont. Cas. Co.* v. *Clark,* 70 Okla. 187, 173 Pac. 453, L. R. A. 1918F, 1007; *Richards* v. *Stan. Acc. Ins. Co.,* 58 Utah 622, 200 Pac. 1017, 17 A. L. R. 1183. Moreover, this question of interpretation is not new and it has received considerable attention from the courts, as indicated by the cases cited. The preparation of the policy terms was in the hands of the defendant, and, if it was intended that sunstroke or heat exhaustion should be excluded from the hazards covered, the insurer could have easily done so in the same manner and in the same policy provision in which disease, bodily or mental infirmity were treated, thereby settling any doubt that might arise. A study of the cases cited in this opinion will reveal that many insurance companies have expressly included death from sunstroke resulting from accidental means as a hazard covered by double indemnity provisions.

It is apparent that the principal issue herein is narrowed to the oft-repeated query: "What constitutes 'ac-

cidental means' within the terms of a life or accident policy providing for double indemnity in case of death or injury resulting therefrom." The reported cases on the subject are legion, and from them but one conclusion can be drawn—that of the sharp and irreconcilable conflict revealed therein. In the decisions of this Court bearing on the question, only two efforts have been made to define what is meant by "accidental means". In *Sizemore* v. *Casualty Co.*, 108 W. Va. 550, 151 S. E. 841, this explanation is found: "* * * when injury or death follows or results from a voluntary act of the insured, and the act is one which is manifestly dangerous, and one which is not ordinarily done or performed without serious consequences to the doer, such result is not caused by accidental means." In *Miller* v. *Casualty Co.*, 110 W. Va. 494, 158 S. E. 706, 76 A. L. R. 1308, it was stated that "The term 'accidental means' has been variously defined." The opinion then cites with approval and applies *Western Com. Trav. Ass'n* v. *Smith*, (C. C. A. 8th) 85 F. 401, 40 L. R. A. 653, in which an effect, not the natural consequence of the means, which does not ordinarily follow and cannot be reasonably anticipated—which the actor did not intend to produce and which he cannot be charged with the design of producing, is said to be produced by accidental means. The general statements contained in these two cases seem to follow the liberal rule of interpretation, in support of which the opinion of Judge Sanborn in the *Smith* case has been frequently cited. The latest enunciation of this Court on the subject, *Otey* v. *Ins. Co.*, 120 W. Va. 434, 199 S. E. 596, however, without reference to the *Sizemore* case or the *Miller* case, adopts the strict rule of interpretation in such cases. That opinion recognizes that "the question of what are 'accidental means' is one on which there is a sharp division of authority", and then distinguishes between accidental "result" and accidental "means" as follows: "* * * the result of the means * * * was unusual and unexpected, but were those means accidental? * * * The means employed were intentional, not accidental, and do not come within the provisions of the policies sued on." The Supreme Court

of the United States followed the strict rule in *Landress* v. *Phoenix Mutual Life Ins. Co.*, 291 U. S. 491, 54 Sup. Ct. 461, 78 L. Ed. 934, 90 A. L. R. 1382, wherein it is stated: "But it is not enough, to establish liability under these clauses, that the death or injury was accidental in the understanding of the average man * * * that the result 'was something unforeseen, unsuspected, extraordinary, an unlooked for mishap, and so an accident.' * * * The insurance is not against an accidental result." In the jurisdictions where the strict rule has been adopted, it has been held that the death of a person from sunstroke or heat exhaustion, suffered while engaged in the pursuit of his ordinary duties and for which he was employed, is not within the contemplation of a policy providing benefits for death by accidental means. *Smith* v. *Met. Life Ins. Co.*, (La.) 155 So. 789; *Scott* v. *Met. Life Ins. Co.*, 169 Tenn. 351, 87 S. W. 2d 1011; *Cont. Cas. Co.* v. *Pittman*, 145 Ga. 641, 89 S. E. 716; *Adkins* v. *Met. Life Ins. Co.*, 235 Ala. 417, 179 So. 382. In the jurisdictions where the liberal rule is applied, the opposite result is reached. *Cont. Cas. Co.* v. *Bruden*, 178 Ark. 683, 11 S. W. 2d 493, 61 A. L. R. 1192; *Provident Life and Acc. Ins. Co.* v. *Green*, 172 Okla. 591, 46 Pac. 2d 372. For collations and digests of the cases on the two lines of authority see: *Caldwell* v. *Traveler's Ins. Co.*, 305 Mo. 619, 267 S. W. 907, 39 A. L. R. 56; *Bukata* v. *Ins. Co.*, 145 Kan. 78, 67 Pac. 2d 607; *Otey* v. *Ins. Co., supra*; the majority and dissenting opinions in *Landress* v. *Ins. Co., supra*; 17 A. L. R. 1197, 61 A. L. R. 1197; 90 A. L. R. 1387.

We do not believe that the cases of *Collett* v. *Comp. Com'r.*, 116 W. Va. 213, 179 S. E. 657, and *Rasmus* v. *Appeal Board*, 117 W. Va. 55, 184 S. E. 250, in which heat exhaustion was held to be a compensable injury under the Workmen's Compensation Law, apply to the consideration of what constitutes "accidental means", because of the fact that in Workmen's Compensation cases the question is whether there was an injury received in the course of and resulting from employment and not whether there was an injury caused by accidental means.

The syllabi in the *Sizemore, Miller* and *Otey* cases are

limited to the facts of each particular case. However, we must apply the principles expressed in the opinion of the *Otey* case, as the last expression of this Court on the subject of what constitutes accidental means. The appellant contends that the decision in the *Otey* case is conclusive of the case at bar. Briefly, the insured in the *Otey* case died within a few minutes after an injection of novocaine around the tonsils preparatory to an operation for the removal thereof; death resulted from insured's hypersusceptibility or hypersensitivity to the drug, which was unascertainable. The Court, in applying the rule stated, pointed out that the administration of the drug was skillful, that all events leading up to insured's death were exactly as intended by both insured and the surgeon, and that therefore only the result was accidental. Plaintiff in error argues that in this case, while doing exactly the work he intended to do, without any mishap or slip in such performance, Mitchell suffered an unusual and unanticipated result.

With that conclusion we cannot agree. Mitchell was working in a place where the temperature was around one hundred degrees and where sudden changes as to heat and gases were continually taking place. This fact provides the accidental quality to the means, plainly distinguishing the factual situation from that of the *Otey* case. The fact that Sovilla gave Mitchell warning of the "condition" and the further fact that a company rule prohibited workmen in the contact conversion area from working alone, together do not imply that Mitchell thrust himself into danger knowingly. In the first place, he had worked in and about that area for eight or nine years without suffering ill effects, as far as the record shows, for varied periods, longer than that of August 8, 1940, and, secondly, it can not be presumed that Mitchell would attempt an act which might be fatal, or that his employer would wilfully send him into such a danger zone. In the absence of a warning of some unusual danger, Mitchell was certainly entitled to interpret Sovilla's admonition in the light of his years of experience, namely, to exercise care for his safety, and the record is devoid of any showing

of any lack of such care. There is no question herein about the cause of death, in fact, the only evidence offered by defendant is the death certificate from the Department of Vital Statistics, showing heat exhaustion as such cause. From the evidence that the temperature at the vessel was around one hundred degrees, the evidence that sudden changes took place there as to heat, gas and fumes, and the evidence that insured died from heat exhaustion, the jury would have been justified in drawing the reasonable inference that a sudden change in the temperature brought about insured's heat exhaustion. This supplies the slip, mishap, unexpected and unforeseen event or occurrence which preceded the injury, and which was lacking in *Otey* v. *Ins. Co., supra; Scott* v. *Met. Life Ins. Co., supra; Cont. Cas. Co.* v. *Pittman, supra; Smith* v. *Met. Life Ins. Co., supra;* and *Adkins* v. *Met. Life Ins. Co., supra.*

Over the objection of counsel for defendant, the trial court permitted plaintiff to introduce testimony to show that the Workmen's Compensation Commissioner had ruled that Mitchell died of accidental means and as the result of an industrial accident, in other words, that the plaintiff was entitled to death benefits under the Workmen's Compensation Law. This testimony was improper for two reasons: First, as hereinbefore indicated, the basis of liability or compensability in the Workmen's Compensation Law is entirely different from that of the double indemnity provision of the policy sued on; and, second, since the Workmen's Compensation Commissioner is not a party to the present action, nor was the Insurance Company a party to the proceeding wherein death benefits were awarded the widow of Mitchell, the maxim of *res inter alios acta* applies on the question of the relevancy of the testimony. Jones, Commentaries on Evidence, Sec. 611. *Eastburn* v. *N. & W. Ry. Co.,* 34 W. Va. 681, 687, 12 S. E. 819. We cannot say that the jury was not prejudiced by the admission of this testimony. As we have stated, the facts and circumstances adduced in this record would justify a jury verdict for the plaintiff based upon the inference that a sudden change in conditions as to heat

in and about the vessel upon which Mitchell was working brought about his demise from heat exhaustion; the jury, however, is to determine and weigh inferences arising from the evidence. *Young* v. *Ins. Co.*, 114 W. Va. 716, 173 S. E. 566. Moreover, there is the presumption that the admission of illegal testimony prejudices the party against whom it is admitted, and is cause for reversal, unless it is apparent the jury's verdict could not have been influenced by it. *State* v. *Stone*, 100 W. Va. 150, 130 S. E. 124; *Alford* v. *Kanawha R. Co.*, 84 W. Va. 570, 100 S. E. 402; *Ewers* v. *Montgomery*, 68 W. Va. 453, 69 S. E. 907. Such a lack of influence is not apparent in this case. Therefore, on this sole ground we must reverse the judgments of the Circuit Court and the Common Pleas Court of Kanawha County, set the verdict of the jury aside and award defendant a new trial.

*Reversed and remanded.*

Fox, PRESIDENT, dissenting in part.

I concur in the reversal of this case. I think the admission of evidence as to the allowance of compensation by the State Compensation Commissioner was prejudicial error. I dissent from the finding of the majority, that, but for this error, the judgment should be affirmed. While I concede that the circumstances of this case are different from those considered in *Otey* v. *Insurance Co.*, 120 W. Va. 434, 199 S. E. 596, I think that the principles announced in that case should govern here. The majority decision, in my opinion, involves a clear departure from the principles announced therein.