# APRIL TERM, 1920.

STAPLETON *v.* FURNITURE EXHIBITION BUILDING CO.

1. CARRIERS—ELEVATORS—INSPECTION—NEGLIGENCE—QUESTION FOR JURY.

    In an action for the wrongful death of plaintiff's decedent, caused by the dropping of defendant's elevator from the sixth floor, due to the breaking of the bolt to which the cables were attached, where defendant admitted that during the 17 or 18 years the elevator had been in use the part of said bolt where the break occurred, which was hidden by a metal sleeve, had never been removed for inspection, and testimony on plaintiff's part tended to prove that a proper inspection would have disclosed a break therein which had existed for some time, the question as to whether defendant took such precautions in its inspection as a reasonably prudent person should have taken under like circumstances, *held*, for the jury.

2. SAME—CUSTOMS AND USAGES.

    That it was not customary to remove such bolts in the past for inspection, would not bar plaintiff's right of action; but was a fact proper for the jury to consider on the question as to whether defendant exercised reasonable care.

3. SAME—EXAMINATION OF WITNESSES—DISCRETION OF COURT.

    The court below was justified in being liberal in allowing searching inquiry concerning the cause of the death of plaintiff's decedent, since the elevator and all of the machinery connected therewith were entirely within the care and custody of defendant.

ON REHEARING.

4. APPEAL AND ERROR—EVIDENCE—ADMISSIBILITY—EFFECT OF RULING OF TRIAL JUDGE.

    Defendant's contention, on rehearing, that certain testimony, quoted in the former opinion, had been declared incompetent, and stricken out by the trial judge, *held*, not sustained upon the record.

On the question of construction and inspection of passenger elevators, see notes in 2 L. R. A. (N. S.) 749, and L. R. A. 1915E, 726.

(385)

Error to Kent; McDonald (John S.), J. Submitted October 24, 1919. (Docket No. 72.) Decided December 22, 1919. Resubmitted February 27, 1920. Former opinion affirmed April 10, 1920.

Case by Mary A. Stapleton, administratrix of the estate of Thomas J. Stapleton, deceased, against the Furniture Exhibition Building Company for the negligent killing of plaintiff's decedent. Judgment for plaintiff. Defendant brings error. Affirmed.

*Hal P. Wilson* and *Travis, Merrick, Warner & Johnson,* for appellant.

*Martin H. Carmody* and *Fred P. Geib,* for appellee.

Plaintiff brought this suit as administratrix of the estate of her deceased husband, Thomas J. Stapleton, and recovered a verdict of $21,702.62 as damages. The defendant company was the lessee of the Furniture Exhibition Building in the city of Grand Rapids, Michigan, where regular semi-annual furniture exhibitions were shown. These exhibitions seem to have extended over a number of years, although each one lasted little more than one month, so that the building was practically idle during the remainder of the year. On July 8, 1916, one of these semi-annual displays was in progress and the plaintiff's decedent, a furniture salesman, had gone to the sixth floor of the building on a matter of business. On the completion of his errand, he stepped into the elevator to descend to the main floor, when the cage dropped the full distance to the bottom of the shaft, instantly killing Mr. Stapleton and the operator, the only other occupant of the elevator.

The investigation showed that the elevator, which had been installed 17 or 18 years previous to this time, was a cage weighing about a ton and that it was

hoisted in the shaft with a 30 H. P. motor which controlled the cables attached to its top. It was at this important point in the mechanism that the primary trouble occurred. The object to which the cables were fastened was a large, wrought-iron bolt (known as a "draw-bolt" or "king-bolt"), about one inch in diameter. The portion of the bolt which was plainly in sight was U-shaped or clevis-shaped, and it was to the prongs of this clevis that the cables for hoisting the elevator and also the cables connected with the counterweight were attached. Immediately below the U of the clevis, the bolt was encased in a metal sleeve, or box, so that practically the entire length of the bolt below the clevis was concealed from ocular inspection.

After the accident, it was found that the bolt had broken off just a little below the top of the iron sleeve, which, obviously, released the elevator from any connection with the supporting cables. Both pieces of the bolt were afterwards taken to the Detroit Testing Laboratory where they were minutely examined. While there is some controversy as to the qualities and condition of the metal, it fairly appears that, at the point where the break occurred, there was a slight crack running irregularly across about 30% of the surface of the bolt, and from the fact that this was somewhat rusted and discolored, it has been a fruitful source of speculation among counsel as to the probable age of this rupture. The remaining surface of the break was shiny and untarnished, and gave every evidence of having been the point of severance of the bolt at the time of the accident. However that may be, the expert examination revealed, as stated in the defendant's brief, "that at the point where the break occurred and on the side of the bolt where the older part of the break was found, there was a *latent defect* in the bolt, caused by an excessive amount of slag lying crosswise of the diameter of the bolt."

Defendant produced evidence to prove that the elevator was ordinarily in the care of and under the supervision of the superintendent of the building, a competent man who had had experience with elevators. He testified that the mechanism had been inspected periodically every 90 days by professional elevator inspectors, but it appears from their statements on the witness stand that they made only the usual examination and that the metal sleeve had not been detached so that the part of the bolt which was covered by this casing had not been looked at; consequently, neither the inspectors nor the defendant (through its agents) knew of the crack in the bolt and in fact never suspected its existence. The reasons given for the failure of the inspectors to take this precaution are "that it was not the practice or custom of elevator inspectors, in making inspections, to take out bolts of this character for inspection or examination; that not only was this not the custom, but that such a thing had never been heard of in practice," and that "such examination or inspection could not have been made without fastening the elevator cage in some way so that it would be supported, and then disconnect and secure the cables, unscrew the nut on the bolt and take it out, all of which was an operation which would have taken considerable time, requiring the services of two or more men."

It is the contention of the defendant and appellant that, having purchased the elevator from a reputable concern whose product was in common use, it was justified in assuming that it was properly constructed to safely perform the work which it was intended to do and that the defendant would not "be liable for accidents resulting from faults of design or of original construction or latent defects of which defendant was ignorant." Furthermore, it contends that it was only required to make a reasonable inspection of the ele-

vator and that the examinations made by the expert
inspectors were reasonable under the circumstances;
that neither the crack in the bolt nor the latent defect
in the material itself caused by the presence of slag
at the point of severance could have been discovered
in such inspections because not visible, covered as they
were by the metal sleeve, and that, in effect, it would
be entirely unreasonable to impose upon the defendant
the duty of making so careful an inspection to pre-
vent the remote possibility of the occurrence of an
accident such as actually happened.

With reference to the primary negligence charged,
the court directed the jury as follows:

"It appears to be undisputed that the bolt was frac-
tured at the time of the accident. How long it had
been in that condition is a matter of dispute. It ap-
pears from the evidence that the bolt was defective
when the elevator was installed. The defendant would
not be responsible for the original construction or de-
sign of the elevator, but it was the duty of the defend-
ant at all times to exercise ordinary and reasonable
care and diligence to discover and correct any defects,
having in mind the use to which the bolt was put and
the important part it played in the mechanism of the
machinery. Did the defendant discharge the duty?
Did it make such inspection as the law requires? The
fractured bolt was not visible because it was covered
by a sleeve or box. The plaintiff claims that ordinary
care required the defendant, in making its inspections,
to remove the bolt from its covering and examine it.
The defendant says that the ordinary and approved
tests employed by skillful and competent inspectors did
not require the bolt to be removed and inspected.
From the evidence, you will determine whether in the
exercise of reasonable care, it was necessary for the
defendant to remove the bolt for examination and in-
spection. It is undisputed that the defendant did not
do that. So, if you find from the evidence that reason-
able care required the defendant to remove the bolt
and inspect it, the defendant would be guilty of negli-
gence. If you find that reasonable care, as I said, in
the inspection of the elevator required that this bolt

should have been taken out and examined, and that reasonable care in its examination would have disclosed the defects, you would be justified in finding the defendants guilty of negligence.

"If, on the other hand, you find from the evidence that reasonable care did not require the taking out of the bolt for examination, or that its defective condition could not have been determined after taking it out by the customary and reasonable tests, you should find that, so far as the inspection of the bolt is concerned, the defendant was not guilty of negligence."

KUHN, J. (*after stating the facts*). This is not a case where the plaintiff is seeking to hold the defendant for a latent defect which existed when the machinery was installed. The theory upon which she seeks recovery is grounded upon the failure of the defendant to discover the defect, it being claimed that the defect might have been easily discovered if the elevator and its various essential parts had been properly inspected during the 18 years that they had been in use.

The contention of the respondent is that the jury should not have been permitted to find that some sort of an 'inspection should have been made, which, according to custom, had never been deemed necessary and was not customary. Considerable fault is also found with various parts of the charge of the court in submitting the question of negligence to the jury.

Mr. Jesse D. Stoddard, the secretary and treasurer of the Detroit Testing Laboratory and a chemist and metallurgist of considerable experience, was one of the witnesses sworn on behalf of the defendant. With reference to the necessity of inspection of metals which are subjected to heavy strains and which are used where human life would be endangered by their insufficiency he testified in part as follows:

"We know that metal varies over a wide field, in strength qualities. After all these precautions have

been taken, in addition to that, in cases where metal occupies a place where human life is in danger or a large amount of property is in danger in the structure, I believe it is customary to inspect such metal and such structures periodically after they are in place to ascertain whether there are any visible signs of deterioration—there is such practice of inspection carried on.

"*Q.* Isn't it true that experience, such experience as you have observed in connection with the work that you are doing, has established that periodical inspections are desirable and necessary in order to detect apparent signs of deterioration of metals that are in actual use?

"*Mr. Travis* (for defendant): I object to that as incompetent, covering a field that might mean anything.

"*The Court:* No, he may answer that.

"Question read.

"*A.* It is true; apparent signs can be so detected and are so detected.

"*Q.* Do you know the practice that is followed with reference to inspections that are made of structural metals that are subjected to strains and stresses in the course of their use? Is there any custom or practice about that, that you know of?

"*Mr. Travis:* The same objection, your honor.

"*The Court:* He may answer that question.

"*A.* He asked me if I knew the practice that was followed.

"*The Court:* He asked the question whether there was any custom or practice.

"*Q.* Within your knowledge, of course.

"*A.* There is such a custom.

"*Mr. Travis:* I object to it as being too general and for that reason not admissible in this case, and move to strike it out.

"*The Court:* I think I will take it. You may answer it.

"*A.* I said there was such a custom and practice."

The question really is whether or not any hard and fast rule can be laid down as to what ordinary negligence would be under circumstances of this kind. The

fact that it would be difficult to make such an inspection and that it was necessary to block up the car and remove the bolt would be no answer if it was reasonably necessary to do this in order to protect human life and limb. The testimony showed that the cables on this elevator had been changed from time to time and that at such times it was necessary to block up the elevator. At these times, a removal of the bolt would have required but a few moments of extra time and relatively little labor. Tapping the bolt with a hammer after it had been removed from the sleeve, cleaning it and painting it, might have been all that was necessary to satisfy such requirements. The defendant had all the necessary opportunities and facilities for making the proper inspections and tests. But no effort was made for 18 years to determine whether the bolt was in such a condition as to carry the great strain which was put upon it. It seems to us, under all the circumstances in this case, as shown by the record, that it was one of those cases which was peculiarly within the province of the jury to determine whether or not the defendant took such precautions in the inspection of the elevator as a reasonably prudent person should have taken under like circumstances.

The claim of the defendant that it was not customary to remove such bolts in the past would be no excuse and would not bar the plaintiff's right of action, but would be one of the factors which could be properly submitted to the jury on the question of whether or not the defendant exercised reasonable care

What is ordinary and what is reasonable care under all of the circumstances must be determined, in the last analysis, in the light of the experience of ordinary men of affairs. The jury heard all of the testimony and the claims of the parties and were enlightened by all of these facts; they heard testimony

of the means and methods by which the draw-bolt might have been tested, the manner and method by which it might have been removed from its place in the elevator mechanism, the physical structure of the bolt itself, and the testimony of the defendant's inspectors that they had never heard of such a bolt being removed and tested. They heard the testimony of witness Stoddard, above set forth, that material upon the strength of which the safety of human life depends should be occasionally inspected and tested.

There are a number of assignments based upon rulings with reference to the evidence. Considerable latitude was allowed plaintiff's counsel in asking questions concerning the cause of the accident and, we think, properly so, as the elevator and all of the machinery connected therewith was entirely within the care and custody of the defendant and, under the circumstances, the court was justified in being liberal in allowing searching inquiry concerning the cause of the death of the plaintiff's decedent.

We have carefully examined these various assignments of error and we do not find that there was any prejudicial error committed. The crucial questions of negligence were carefully submitted to the jury with clear instructions as to the law pertaining thereto. No complaint is made of the size of the verdict, and, being unable to find any prejudicial error in the record, we are constrained to affirm the judgment.

BIRD, C. J., and SHARPE, MOORE, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred.

### ON REHEARING.

CLARK, J. Counsel for defendant assert that the testimony of the witness Stoddard, quoted by Justice KUHN, had been declared incompetent by the trial court and had been stricken out. The basis of the assertion is found in the record immediately following

the testimony so quoted, and is a part of the further cross-examination of this witness for defendant:

"*Q.* To what particular line of structures does the practice to which you have just testified apply?

"*A.* To building materials largely, structural materials, materials entering into the production of vehicles such as automobiles, aeronautics, the production of aeroplanes, motors; in fact, the whole field of manufacturing industry is substantially covered today by specifications drawn by the American Society for testing materials, for the inspection of materials entering into the various uses.

"*Mr. Travis:* May my objection stand?

"*The Court:* I think I will strike out the answer. After hearing the answer, I am not sure that it is admissible. I will strike it out.

"*Mr. Geib:* It seems to me, your honor, it would be competent, at least, in so far as it applies to structural materials. He has testified that there was a custom he knew about. Now, I am asking him to what that custom relates, or applies, and he said, among other things, structural materials.

"*Mr. Travis:* If counsel desires to ask this witness if he knows whether or not there is any custom of inspecting bolts of this kind when used in this manner, I have no objection, if the witness knows, to his asking that.

"*The Court:* That is as far as I intended to have him go in the first statement.

"*Mr. Geib:* Your honor, we are not limited to that. That is getting back to the proposition that I think was mentioned the other day, that a group of inspectors or a group of owners or any one else engaged in a particular business cannot establish a rule of negligence or a diligence binding on a court or jury.

"*The Court:* I think you are right about that, but I do not know that it goes to this question. You can ask him about this business, whether there is any custom in such matters, keeping as close to the elevator as you can."

By the first ruling of the trial court above quoted, the answer to one question was stricken. The later observation of the court did not have the effect of

striking out the testimony quoted by Justice KUHN, nor was any motion made to strike such testimony, and it was not here urged that it was admitted erroneously.   Defendant's contentions upon rehearing are not sustained.   We find no reason for disturbing the former conclusion.

The judgment is affirmed.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, STONE, BIRD, and SHARPE, JJ., concurred.