EMPIRE OIL & REFINING CO. v. HOYT.

No. 8181.

Circuit Court of Appeals, Sixth Circuit.

June 7, 1940.

Gilbert W. Hand, of Bay City, Mich., and Frank H. Bacon, of Bartlesville, Okl. (Gilbert W. Hand, Harold J. Hand, and Frank H. Bacon, all of Bay City, Mich., on the brief), for appellant.

O. L. Smith, of Detroit, Mich. (Cook, Smith, Jacobs & Beake, of Detroit, Mich., on the brief), for appellee.

Before HICKS, ALLEN, and HAMIL-TON, Circuit Judges.

HAMILTON, Circuit Judge.

Appellant, Empire Oil and Refining Company, appeals from a judgment of $8,092.00 in damages against it in favor of the appellee, Mabel Finch Hoyt. In 1930, appellee made a lease to the appellant on a royalty basis of one-eighth of the oil produced on forty acres of land located in proven oil territory in Porter Township, Midland County, Michigan, for the drilling, removal and sale of oil, under the terms of which appellant was authorized to drill wells and operate them at its risk and expense including the right to use contiguous surface land for that purpose. Appellant assigned its rights in the south half of the lease to the Dokenva Gas Corporation, which acreage is not involved in this action.

Appellant drilled two wells in the north twenty acres of the tract. Oil in quantities was found in each, which later disappeared as the result of water encroachment, which appellee claims was let in because of negligent acidization by appellant. The cause was submitted to a jury which found for appellee.

At the close of the evidence, appellant moved for a directed verdict, to the refusal of which error is assigned. It insists (1) that there was no substantial evidence of negligence, (2) that there was no substantial evidence that appellee sustained any damage, and (3) that the acidizing was under the supervision and control of an independent contractor.

In 1934 appellant began the drilling of one well on the east ten acres of the north twenty acres of the tract, which was completed April 29, 1934, and which is referred to in the record as "Finch No. 1." It began the drilling of the second well April 4, 1934, which was completed May 30, 1934, and is referred to in the record as "Finch No. 2." Finch No. 1 had an oil-bearing strata from 3,408 to 3,411 feet and then a structural interference of 14½ feet, with a resumption of producing strata of 1½ feet. Finch No. 2 had a producing strata beginning at 3,408 feet, extending to 3,411½ feet.

Appellant concluded that Finch No. 1 at a depth of 3,427 feet did not produce oil in paying quantities and it employed the Dow Chemical Company to acidize it on May 9, 1934, which increased production from 115 to 1,400 barrels daily. The same treatment of Finch No. 2 on June 4, 1934, increased production from 50 to 1,930 barrels daily. Salt water shortly impregnated the wells and they were abandoned in September, 1935, after production of 36,000 barrels of oil together

with large quantities of salt water which were mechanically separated. Appellee received in royalties $4,483.63 and appellant sustained a net loss of approximately $22,000.

Appellee claims that when appellant acidized the wells it negligently failed to take into consideration the underlying proximity of salt water, the known characteristics and quality of the oil-bearing strata, the limestone texture out of which the oil drained, which resulted in its using an improper quantity of acid at an inaccurate pressure without an underlying blanket. She claims that as a proximate result, the oil-bearing strata under her property became so impregnated with salt water as to make it worthless for oil production.

In order to dispose of the problem presented it is well to bear in mind some of the well-known conditions essential to the occurrence of oil in the earth's strata, which are: presence of rocks of sedimentary origin or in some instances proximity to rocks of such origin; absence of intense metamorphism; presence of sandstones, limestones, sand or other strata sufficiently porous to hold oil; some source from which the oil may have been formed and absence of water so that the oil is permitted to accumulate into pools, also suitable cover to prevent the oil from seeping away or being pushed to the surface of the earth or into adjoining strata by underground waters; suitable structure or attitude of the strata to cause oil to be collected locally into pools with the assistance of such other factors as water gravitation or rock pressure. Where beds have been folded, as in most of the known oil fields of the world, the gas, oil and water separate and seek their respective levels according to their relative specific gravity. Whatever material cause may account for the movement of gas, oil and water, the law of gravitation being ever operative, the accumulation is in the order of the densities of the subject; hence, on an anticlinal, monoclinal or quaquaversal structure, gas lies nearest the crest, oil lower down and water still lower on the flanks of the uplift.

The area in question is known as the "Porter Field" with oil-bearing lime strata being from 90 to 90½% pure sodium, magnesium or calcium carbonate. Appellee's land was near the edge of the oil structure with large producing wells to the north, medium wells to the east and west, and small wells to the south, tapering off into salt water wells or dry holes. Underground water pressure was menacing the oil, constantly forcing it upward through the well hole and, from other wells drilled in the field, the approximate water level into which it was dangerous to sink a well was known.

The Dowell method for increasing the flow of oil from a well is the use of hydrochloric acid, a liquid chemical reagent, strong and of extreme activity, which enlarges and reopens pores in oil-bearing limestone formations. The mechanics of the process are to first fill the well with oil, using inhibited acid to prevent corrosion of the tubing, applying pressure to force the hydrochloric acid into the rock channels and pores, which causes their softer parts to become soluble. After a predetermined time, the acid is flowed or pumped out, leaving enlarged pores in the oil-bearing strata. The hydrochloric acid attacks the limestone formation in all directions and, amenable to the law of gravitation, the pressure downward is greater than lateral assuming equal density of strata.

Appellee insists that to correctly acidize the wells in question, a blanket of calcium chloride or some other heavy inert liquid at the bottom of the well was required to arrest the penetration of the hydrochloric acid to the salt water level. Appellant admits the corrosive acid was used without a blanket and the real issue in the case turns on whether its non-use constituted negligence. Before using the Dowell method, it is essential that the operator give consideration to the texture of the strata as shown from the cuttings of the drill and also the water level as shown from the drilling of contiguous wells or any other available source of information. The evidence shows appellant furnished to Dow for analysis the cuttings from each of the wells and there is substantial evidence in the record that the operator for Dow, in determining the method of acidizing, assumed there was a thickness of twenty-five feet in the oil-producing limestone. He testified this data was furnished him by appellant's Supervisor of Operations. This witness also testified that if he had known the thickness of the limestone was only three feet or less, his method of acidization would have been different.

The evidence shows that before the completion of Finch wells, a salt water level at 3,428 feet was established in an offset well, 650 feet distant. This was 2½ feet below the bottom of Finch No. 1, and 1.2 feet below the bottom of Finch No. 2. Two other offset wells completely drilled in before Finch wells also established the salt water level at approximately the same depth. There is substantial evidence that before it acidized the Finch wells, appellant knew, or by the exercise of ordinary care, could have known that a dangerous water level was within 2½ feet of well No. 1 and 1.2 feet of well No. 2.

Expert witnesses testified that in their opinion, the water level in the offset wells was a clear indication water would be encountered at practically the same depth on appellee's property. They also testified that in their opinion drilling into salt water was bad oil practice which would make it impossible to protect adjacent lands from its encroachment within a reasonable circumference.

Other expert witnesses testified it was bad practice to acidize if there were reasonable grounds to believe salt water would thereby infiltrate. One witness testified it was bad oil practice to put hydrochloric acid in porous limestone within five or ten feet of salt water and another that the quantity of solution and the pressure used in the wells in question would have opened up the porous limestone downward for more than 1.2 feet.

Assuming that the water level established by the offset wells was the same as in the Finch wells, according to this testimony the use of the hydrochloric acid opened the way for salt water to penetrate the oil-bearing limestone underlying the surface of appellee's property.

Appellant urges on us that its testimony as to good oil practice is that of actual operators while that of appellee is of experts educated in the science with no practical experience and on that account appellee's evidence is no more than a scintilla.

■ The jury, or the court when trying without one, is often confronted with issues the proper understanding of which requires specialized knowledge or experience and which cannot be determined intelligently from deductions and inferences drawn on the basis of ordinary knowledge and practical experience. On such issues testimony of one possessing special knowledge or skill is required to arrive at a just and intelligent conclusion. Experts may be men of science educated in the art or persons possessing special or peculiar knowledge acquired from practical experience. The admission of such testimony is for the court, its weight for the jury.

■ The relation of cause and effect may be of the highest consequence in connection with mining matters. Where relevant, it may be stated by one shown to be competent and such a witness may testify as to what in his opinion may be a satisfactory reason for given occurrences, such as salt water coming into oil-bearing strata, and his knowledge of the effect of hydrochloric acid on limestone may be the result of his own experiments as in the case of one of the witnesses here. Eidt v. Cutter, 127 Mass. 522, 524.

■ The lessee ordinarily is the judge of the method and manner of producing oil from the leasehold where he acts in good faith, but where oil has been found in quantities, the question of further development and its method is not subject to determination of either of the parties alone, as the object and purpose of the operation is to obtain a benefit for both the lessor and the lessee. Neither, in the absence of some stipulation to that effect, is made arbiter of the extent of care with which the operation shall proceed and each is bound by standards of what is reasonable, or putting it another way, the care to be exercised is what would be reasonably expected of operators of ordinary prudence having regard to the interest of both lessee and lessor and, although the lessee acts in good faith, if, in so doing, he commits some act which a reasonably prudent person would not do under the same or similar circumstances, he is liable for the resulting damages. Considering the migratory nature of oil and the tremendous pressure exerted on its movement by underground water, all of which must have been in the minds of the parties in the execution of the lease, it is manifest that it was implied that the lessee would exercise reasonable diligence to avoid the destruction of the oil pool by water encroachment.

■ Reasonable care under the circumstances here present involved good faith observation or consideration of all relevant data and its lessons, including the texture of the oil-bearing limestone, its suscepti-

bility to disintegration when brought into contact with hydrochloric acid, and the proximity of water pressure, and it also required consideration of what was expectable, though unknowable, about the condition of the strata three thousand feet underground, and what effect the penetration of salt water on the Finch wells would have on the oil-bearing limestone underlying twenty acres of the leasehold.

Appellant's contention that its decision to acidize without a blanket was the result of studied judgment made in good faith and in accordance with established custom and practice in the Porter field on which no negligence could be predicated, is unavailing.

■ It is conceivable that the established custom and practice might be negligence. What is usually done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence whether usually complied with or not. In our opinion the proof of custom was insufficient conclusively to sustain appellant's claim of immunity. Texas & Pacific Railway Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905; Fletcher v. Baltimore & Potomac Railroad Company, 168 U.S. 135, 141, 18 S.Ct. 35, 42 L.Ed. 411; Stapelton v. Exhibition Bldg. Co., 209 Mich. 385, 177 N.W. 139.

■ Considering the testimony in favor of the appellee in its strongest light and disregarding all countervailing proof, there is substantial evidence to support her claim of negligence. It was a question for the jury.

Appellant urges that the undisputed evidence shows the Finch wells, before acidization, were small, non-commercial and worthless. It further argues that by the acidization a production of 36,000 barrels of oil was obtained which otherwise would have been lost and that the small initial production of the wells makes inapplicable the proof of total oil reserves in the twenty acres of the leasehold by a comparable production of contiguous wells.

■ Under the laws of Michigan, the measure of damages for failure diligently to develop and operate an oil leasehold on a royalty basis after the discovery of oil thereon, is the rents or royalties which would have accrued to the lessor if the lessee had fully complied with his contract. Ross v. Damm, 278 Mich. 388; 270 N.W. 722.

· Appellee introduced records of production to May 1, 1937, of twenty-three wells offsetting her twenty acres which showed average production per well of 93,948 barrels. Assuming that the two wells on her property which produced 36,000 barrels, if properly developed would have produced the same number of barrels as the offsetting wells, she sustained a loss in production of 151,869 barrels, which, under the royalty rate of one-eighth, would have been 18,987 barrels, and at the prevailing market price of $1 per barrel, would have returned to her $18,987. The jury awarded her $8,092.

■ Because of the speculative and uncertain nature of oil properties, great difficulty is experienced in proving a reasonably accurate basis for computing damages arising from breach of a covenant in their development, but in order that the obligations of such agreements shall be respected, the courts only require the establishment of such damages by the best elements of which the subject is capable, provided it relieves the jury of the necessity of reaching an arbitrary conclusion or one without substantial foundation in fact. Ross v. Damm, supra.

■ In determining damages consideration should be given to the situation of the parties, the character of the mineral, the nature of the oil-bearing strata, whether dense or soft and porous, developments on contiguous land and the production from offsetting wells. The formula may be crude, but in most cases unliquidated damages growing either out of breach of a contract or the commission of a tort are seldom susceptible of exact measurement. Daughetee v. Ohio Oil Company, 263 Ill. 518, 105 N.E. 308; Sinclair Oil & Gas Co. v. Bryan, Tex.Civ.App., 291 S.W. 692. Appellee showed by the evidence the character of the oil-bearing limestone underlying her land and that under adjoining lands, the number and production of wells drilled on adjoining lands, their distance from her property and the amount of oil produced. When the peculiar and distinctive characteristics of the mineral substance, its elusive and migratory nature, its disposition to travel in the direction of least resistance and to flee from pressure, and to find vent through the most accessible openings, are considered, there is sub-

stantial evidence to support the verdict of the jury.

The relation of independent contractor relied upon by appellant has no application to the facts in this case. Appellant contracted with appellee to develop and extract oil from the property described in the leasehold and its obligation to exercise reasonable care in the use of the premises was an implied part of its contract. This being true, it is a well-recognized rule of law that it cannot shift its obligation to another by an independent contract to which appellee was not a party and to which she did not assent. Maryland Dredging & Co. v. State of Maryland, 4 Cir., 262 F. 11; Minnetonka Oil Co. v. Haviland, 55 Okl. 43, 155 P. 217; Peerless Manufacturing Co. v. Bagley, 126 Mich. 225, 85 N.W. 568, 53 L.R.A. 285, 86 Am. St.Rep. 537.

Judgment affirmed.