## SECURITIES AND EXCHANGE COMMISSION v. THOMASSON PANHANDLE CO. et al.

### No. 2926.

Circuit Court of Appeals, Tenth Circuit.

Nov. 3, 1944.

---

leged specific violations of the Act with respect to the sale of securities in two promotions, one known as the Wright and the other as the Tate. It further alleged that the defendants and each of them would, unless restrained and enjoined, continue to engage in the acts and practices set forth in the complaint. In their answer, the defendants denied that they were engaged or were about to engage in acts or practices which constituted or would constitute violations of the Securities Act of 1933, and alleged that no securities were offered or sold by them subsequent to June 15, 1943. At the trial it appeared, during the course of the testimony, that the defendants had suspended sales of securities in the Wright and Tate promotions.

The Commission offered to prove that after the commencement of the action, the defendants started a new promotion known as the Keys; that it followed substantially the same pattern as the Wright and Tate promotions; and that the defendants offered securities for sale in the Keys promotion on July 16, 1943. The court rejected the evidence with respect to the Keys promotion. The court informally found that the violation with respect to the Wright and Tate promotions had ceased before the beginning of the action and, for that reason, denied injunctive relief. The court stated:

"If the Government desires, I will hold the case open, and at any time they may apply on a proper showing that these acts have been continued or renewed in any way, the injunction will be granted with such penalties as may be proper in view of the warning the defendant has had."

Counsel for the Commission stated that they desired the court to either grant or deny the injunction. Thereupon, the trial court dismissed the action. The Commission has appealed.

The evidence established these facts: Thomasson was engaged in the business of prospecting for oil. The Panhandle Company, a Colorado corporation, was completely controlled by Thomasson. It was used as a drilling corporation in connection with Thomasson's oil business. Thomasson's method of operation was to select a location to drill a well, obtain a block of oil leases adjoining the well site, and finance the drilling by selling stock in the Panhandle Company and assignments of oil leases

Milton V. Freeman, Asst. Sol., of Philadelphia, Pa., and A. Marvin Lungren, Atty., Securities and Exchange Commission, of Denver, Colo. (Roger S. Foster, Sol., of Philadelphia, Pa., William P. Bruton, Atty., of New York City, and John L. Geraghty, Regional Adm'r, Securities and Exchange Commission, of Denver, Colo., on the brief), for appellant.

Foster Cline and F. J. Knauss, both of Denver, Colo., for appellees.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

On July 13, 1943, the Securities and Exchange Commission[1] brought this action under § 20(b) of the Securities Act of 1933, 15 U.S.C.A. § 77t(b), to enjoin the Panhandle Company and Thomasson[2] from engaging in acts and practices constituting violations of § 17(a) (2) and (3) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a) (2, 3). In its complaint, the Commission al-

---

[1] Hereinafter referred to as the Commission.

[2] Hereinafter referred to collectively as the defendants.

on the land surrounding the drilling site. The lease assignments were sold on the representation that the defendants would drill a test well. The stock and lease assignments were sold before and during the course of the drilling. Thomasson had carried out the same plan of financing his drilling operations for many years and had obtained a selective mailing list of prospective investors. Prior to the Wright and Tate promotions, Thomasson had financed the drilling of a well known as the Baker which resulted in a dry hole. Thereafter, in April, 1942, Thomasson commenced the sale of stock and lease assignments in the Wright promotion to finance the drilling of the Wright well in Callahan County, Texas. The plan contemplated the switching of persons who had invested in the unsuccessful Baker well into some participation in the Wright well, involving an additional investment in the Wright promotion. During the period from April, 1942, to February, 1943, the defendants obtained between $30,000 and $35,000 from investors in the Wright promotion. The Wright well proved to be a dry hole in February, 1943. On February 23, 1943, Thomasson advised his investors that the Wright well was a dry hole and proposed a plan to "arrange some satisfactory 'switchover' of your Wright lease investment." A week later Thomasson commenced the Tate promotion for the purpose of financing the Tate well in Eastland County, Texas. In his letter of March 2, 1943, to the Wright investors, Thomasson said "We will all share in this well the same as we would have in the Wright. If this well is successful, I believe I can work out a plan to reimburse you for what you put into the Wright leases, or switch-over your lease investment around both the Baker and Wright wells into a good oil prospect." The Tate promotion was continued from March, 1943, to June 15, 1943. On June 21, 1943, the defendants advised their list of investors, by letter, that the Tate well was a dry hole and that they proposed to abandon drilling on that lease for the present. That letter contained the following statements:

"Rentals on our Tate leases are not due until January, 1944. Perhaps before the rentals are due we can drill another Tate well but we can't do it now. I suggest we try to do it if our next wildcat is successful, and with that possibility in mind, that we just hold the Tate leases in a block until we see what we can do."

"We are now working on getting up leases on Two more structures and it is my plan to make a switch-over of the Wright leases—half to one and half to the other, thus giving Two good chances for a gusher for those who bought Wright leases and Two More chances for the Thomasson Panhandle stock—and I expect to be able to present the definite plan next week."

That letter was sent out three weeks before the complaint in the instant action was filed.

The Commission offered to prove that, pursuant to the promises made in that letter and after the commencement of the present action, the defendants, in fact, commenced a new promotion, known as the Keys, of substantially the same pattern as the earlier promotions. Embraced in the proof proffered was a letter of July 16, 1943. The letter made representations with respect to the Keys promotion and contained the following statements:

"Enclosed are a map copied by Everitt from the Oil and Gas Journal—showing the 'trends' along which many of the oil fields in central Texas extend; a map of the Keys Block of acreage in Concho County, Texas, showing its relation to commercial gas wells and wells that are reported to have shown oil; Everitt's statement of why he recommends drilling a well on this block; a statement of my plan to sell Keys leases and make a switch-over of at least Half of the Wright Leases, thus giving what I think is a splendid chance to make good on the Wright lease investment with the further plan to arrange a switch-over of the Other Half of the Wright leases to the next good oil prospect I may be able to get."

"If I can receive sufficient cooperation from the Thomasson Panhandle Company stockholders and especially from those who bought Wright leases, I want to drill this proposed 'Keys well' in Concho County, Texas, and give those who will buy the Keys leases a 'switch-over' of Wright leases. For each acre of Keys leases bought I will give one Free Acre of Keys leases as a substitute for one acre of Wright leases— 'A' for 'A' and 'B' for 'B'. I have enough leases to switch-over Half of the Wright 'A' and Half of the Wright 'B' leases, and use the net proceeds to drill the Keys well and for administrative expenses. The Keys leases will be sold by me personally at actual cost so I can give the Free Lease with each lease bought. The Company will own a Half Interest in the Keys well, and the

stock will therefore share in the Keys well and wellsite."

The evidence adduced established false representations with respect to the Wright and Tate promotions. The evidence with respect to the Keys promotion, was admissible for the purpose of proving the allegation of the complaint that the defendants would continue to engage in the acts and practices set forth in the complaint. The proffered evidence showed that the Keys promotion was following the fixed pattern of the plan or scheme which the defendants had adopted and had used in prior promotions. It was a continuation of that plan or scheme.[3]

In carrying out the several promotions, the defendants used reports on the drilling structures made by one J. H. Everitt. The complaint alleged that the defendants stated Everitt's opinion was as good as the average geologist's and that he had a scientific basis for his conclusions; that Everitt had done no geological or geophysical work in the drilling area; that his report was not based on any geological or geophysical work, and that he had no scientific basis for any conclusions with respect to the possibility for the production of oil in the lease areas. The Commission took Everitt's deposition for the purpose of showing the basis of his report and conclusions and the methods employed by him. It then sought to show, not for the purpose of contradicting or impeaching Everitt, that there was no scientific basis for his admitted methods. The trial court rejected that evidence. It was admissible, not for the purpose of impeaching Everitt, but for the purpose of proving a specific allegation of the complaint.

The Commission also offered in evidence two exhibits prepared by Phillip Maverick, a qualified petroleum engineer and geologist, for the purpose of showing the falsity of specific representations made by Thomasson as to the geological structures beneath the Wright and Tate drilling sites. The determination of the existence of geological structures and conditions favorable for the production of oil involves technical skill on which the opinion of a qualified expert, based on personal observa-

tion and investigation, is clearly admissible.[4] We think the court erred in rejecting such exhibits.

The judgment is reversed and the cause remanded with directions to proceed further in accordance with this opinion.

---

[3] See National Labor Relations Board v. Express Pub. Co., 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930; Otis & Co. v. Securities and Exchange Commission, 6 Cir., 106 F.2d 579, 583, 584.

[4] Empire Oil & Refining Co. v. Hoyt, 6 Cir., 112 F.2d 356, 360; United States Smelting Co. v. Parry, 8 Cir., 166 F. 407, 411–415.