### STATE LINE OIL & GAS CO., Inc., v. THOMAS et ux.

No. 3943.

Court of Civil Appeals of Texas. Texarkana.

Jan. 26, 1931.

Rehearing Denied Feb. 5, 1931.

Vinson, Elkins, Sweeton & Weems, of Houston, and Davidson, Blalock & Blalock, of Marshall, for appellant.

Beard & Abney, of Marshall, for appellees.

SELLERS, J.

Appellees brought this suit against appellant in district court of Harrison county on June 7, 1929, to recover damages for the failure of appellant to use due diligence in drilling offset wells to those on adjacent lands to prevent drainage from the premises of appellees then held by appellant under a certain mineral lease. The case was tried to a jury

upon special issues, and upon the verdict judgment was entered for appellees for the sum of $760, and appellant brings this appeal.

█ It is well-settled law in Texas, that, to establish a cause of action such as here relied on, it must affirmatively appear both from the pleadings and evidence (1) that appellant could have drilled a well or wells on the land in controversy, producing gas at a profit to itself. At the time alleged, that is, after deducting the cost of drilling such a well, maintaining the same, and marketing the gas therefrom, the appellant would have received a reasonable profit; (2) that appellant, in the exercise of ordinary care, should have drilled a well or wells on said land at the time alleged with reasonable expectation of receiving a reasonable profit from the gas produced after deducting the expenses incident to the drilling, development, and marketing of the products.

Under various assignments, it is insisted that the preponderance of evidence was in favor of the defendant, and that such evidence was insufficient to authorize the court to submit the case to the jury, and that the court erred in refusing to give the appellant's requested charge to return a verdict in favor of the defendant.

The evidence in this case discloses that the Azzie Thomas tract of land, which is covered by the mineral lease in question, is located in Harrison county, Tex., in or near what is known as the "Waskon Gas Field." It is shown from the evidence that the first well in this field was discovered some time in 1923 or 1924, and that the field was practically depleted about the first of 1928. There were four sands in this field from which gas was drawn, namely, the Nacatoch sand, which was a shallow sand discovered at about 1,000 feet; the Blossom sand, which was discovered at about 1,900 feet; another sand was at 2,300 feet; and still another at around 2,800 feet. The great majority of the wells of this field were drilled to the Nacatoch and the Blossom sands. The average cost of drilling a well to the Nacatoch sand was shown to be about $4,000 and to the Blossom sand around $8,000.

The record discloses there were never any wells drilled in this field south of the Azzie Thomas tract of land, and that there were never any wells drilled to the east of said tract, except one which was drilled some mile and one-half to the east, and which proved to be a "dry hole." The main body of the wells drilled in this field lies to the north, northwest, and west of the Azzie Thomas tract. The closest well in proximity to the Azzie Thomas tract is what is known as the Ferguson-Abney well No. 1, which is about 900 feet from the northwest corner of the Azzie Thomas tract, and never did produce sufficient gas to pay for the drilling of same. The next nearest well is just west of the Ferguson-

Abney well, and is known as the Ferguson-Abercrombie No. 1. This well is about 1,400 feet from the Azzie Thomas tract, and is now "dead," and never did produce sufficient gas to pay for the drilling. There is another well just south of the two wells above mentioned known as the Morris-Abercrombie well, which is about 1,500 feet from the Thomas tract; this well is now "dead," and never did pay for the cost of drilling. There is a well that is known as the H. C. Morris-C. B. Hickman No. 1, exact distance of which is not disclosed by the record, but is farther from the Thomas tract than any of the wells mentioned, and is located northwest of the northwest corner of said Thomas tract. This well barely paid the cost of drilling. Immediately north of the northeast corner of the Thomas tract, and about the same distance as the H. C. Morris-C. B. Hickman No. 1, are two wells known as the A. C. Scott-Stringfellow No. 1, and the A. C. Scott-Stringfellow No. 2. Neither of these wells ever paid for the cost of drilling.

The first witness offered by appelles was E. C. Kaster, who testified that he drilled the wells in closest proximity to the Thomas tract. He stated that he was a driller and not a geologist, and would not undertake to say which way the course of the structure was taking in that part of the field; that practically all he knew about the structure in the two wells he drilled near the Azzie Thomas property was they did not pay out. Another witness called by the appellees, W. F. Parker, testified that he did not know much about the structure in that part of the field in the vicinity of the Azzie Thomas tract, as he did not operate in that part of the field. This witness was not a geologist, but one who had had drilling experience in the Waskom oil field. The witness D. Gorden, who testified for appellant, appears to be the only geologist who testified at all in the case. He testified that he knew where the Azzie Thomas tract of land was located in the Waskom field, that he had made a study of that particular area in the immediate vicinity of the Azzie Thomas tract, and that it was his opinion as a geologist that that tract, if it had been drilled at any time during the history of the field, would not have produced a sufficient amount of gas to pay the expenses of the drilling.

In Steele v. American Oil Development Co., 80 W. Va. 206, 92 S. E. 410, 411, L. R. A. 1917, p. 975, the Supreme Court of West Virginia states the rule applicable to this character of cases to be:

This suit was instituted to recover damages for injuries claimed by the plaintiffs because of the failure of the defendant to drill oil wells on lands of the plaintiffs so as to prevent wells drilled on adjacent lands from draining the oil from plaintiffs' lands and thereby depriving the plaintiffs of the royalties thereon. * * * It can-

not be doubted that in order to the recovery of damages from a lessee in such a case as this it must appear from the evidence that it is reasonably certain that oil from plaintiffs' lands had been, or is being, drained by wells drilled on other lands. Of course, from the nature of the subject-matter it is impossible to prove this with absolute certainty, but it is not impossible, nor is it difficult, to prove such a state of circumstances, if they exist, as would reasonably lead to the conclusion that such was the fact. It would be, not only possible, but easy, to show the character of the sands in which the oil was found on the adjoining lands. It could also be easily shown what wells had been drilled on adjoining lands, how far they were from the lands of the plaintiffs, and how much oil had been produced therefrom. It could also be shown what area would probably be drained of the oil by a well drilled in the particular sand in which the wells were drilled on the adjoining land, and if such area so probably drained included a part of plaintiffs' land, it might then be reasonably assumed that these wells on adjoining lands were draining oil from plaintiffs' lands.

"However, it must be remembered that the obligation of the lessee does not require him to drill wells wherever there is a reasonable expectation that some oil may be found, but it must appear that there is a reasonable expectation that the returns to the lessee from the oil which will be produced from the drilling of such a well will at least compensate him for the expense incurred in drilling the well and producing the oil. This cannot be left to conjecture, but must have for its basis some substantial proof. In a case like this it could be shown what would be the cost of drilling a well through the particular sand in which the oil was found on the adjacent lands; what would be the approximate cost of producing and marketing the oil therefrom; what the production was from wells drilled in close proximity to this land; and it might be reasonably assumed, if wells in close proximity produced sufficient oil to compensate the lessee in drilling them, that a well drilled upon plaintiffs' land would do likewise. However, in determining this question all of the elements which would have a tendency to influence and guide the judgment of one producing oil must be considered. The fact that wells drilled in close proximity proved to be barren would be a material consideration, as well as the fact that productive wells were so drilled. In this case it is shown that there are barren wells drilled in close proximity to the plaintiffs' land at the point at which it is contended defendant should have drilled a well. It is also shown that productive wells were drilled in such close proximity. It is not shown, however, by any satisfactory evidence what would be the cost of drilling a well at the point indicated, nor is it shown, or attempted to be shown, that even though a well were drilled on plaintiffs' land to prevent the drainage of oil therefrom, and it produced as much oil as the largest well drilled on the adjoining lands, this would be sufficient to compensate the lessee for the expense of drilling the well, maintaining the same, and marketing the oil therefrom. We cannot assume that this would be the case, particularly when the matter is so easy to be proved. Nor is it shown in this case the extent to which a well pumped and worked as the wells on the lands adjoining the plaintiffs were pumped and worked would drain the oil from plaintiffs' land. There must be those who are acquainted with the nature of this sand in that locality, and who could, from their experience, give some reasonable data or information from which it could be determined with reasonable certainty that the wells being operated on adjoining lands were draining plaintiffs' oil, and the extent thereof. * * *

"It might be shown by those familiar with the production of oil in this sand that a well drilled through it, pumped as these wells were pumped, would, in all probability, drain an area of so many acres, and that a given percentage of this area so drained is the lands of the plaintiffs. If such evidence were introduced, it would perhaps form a basis upon which the jury might determine with some reasonable certainty how much of plaintiffs' oil had been drained by the wells on adjacent lands."

When the evidence in this case is measured by the foregoing rule, there can be little doubt but that the trial court fell into error in refusing to instruct the jury to return a verdict for the defendant.

We are not unmindful of the rule that a judgment must not be reversed on facts when there is any substantial evidence to support it, yet to allow this judgment to stand would be to approve of evidence which amounts to nothing more than speculation.

For the reason above set out, the judgment of the trial court is hereby reversed, and judgment entered for appellant.