No. 34,559

WARD V. MYERS et al., *Appellants*, v. SHELL PETROLEUM CORPORATION et al., *Appellees*.

(110 P. 2d 810)

288

Opinion filed March 8, 1941.

*Ezra Branine, Alden E. Branine, Fred Ice,* all of Newton, *James L. Galle,* of McPherson, *W. L. Cunningham, D. Arthur Walker, Wm. E. Cunningham,* all of Arkansas City, *R. O. Mason,* of Bartlesville, Okla., and *Kenneth L. Hodge,* of Kansas City, Mo., for the appellants.

*Albert Faulconer, Kirke W. Dale, C. L. Swarts,* all of Arkansas City, *Clayton E. Kline, M. F. Cosgrove, Balfour S. Jeffrey, Robert E. Russell,* all of Topeka, *George W. Cunningham, Paxton Howard* and *Ralph J. May,* all of Tulsa, Okla., for the appellees.

The opinion of the court was delivered by

WEDELL, J.: This was an action by the owners of an 80-acre tract of land to recover damages from the defendants, Shell Petroleum Corporation and McPherson Oil & Development Company, for breach of the implied covenant in an oil and gas lease to explore, develop and produce *oil* from each of two alleged oil-bearing sands between certain dates. A general demurrer to plaintiffs' evidence was sustained upon the ground the evidence was so speculative as to constitute merely guesswork. From that ruling plaintiffs appeal.

We shall refer to the Shell Petroleum Corporation as the "Shell," to the McPherson Oil & Development Company as the "McPherson," and to the lease involved as the "Myers 80."

The Myers 80 was located in what is known among oil men as the Galva Sector of the Ritz-Canton field of McPherson county. The

Myers 80 was leased for both oil and gas by plaintiffs, five owners of undivided interests, under three separate leases of the same character, namely, a regular Kansas producer 88 form. The leases were executed February 3, 1926, and November 26, 1927, to the Roxana Petroleum Corporation. The name of that company was later changed to Shell Petroleum Corporation. We shall refer to the leases as one lease. The basic, or primary, term of the lease was five years. Under the terms of the lease the lessee was permitted to pay rentals in lieu of drilling during the primary term. From production lessors were entitled to one-eighth of the oil and one-eighth of the revenue from the gas produced. The lease was assignable. Rentals were regularly paid until February, 1931. In January, 1931, a commercial gas well was completed in the center of the north half of the 80 at a depth of 2,939 feet. Shortly thereafter, and in 1931, the McPherson entered into a contract with appellants whereby it paid them stipulated sums of money in lieu of drilling a second gas well in the south part of the Myers 80. The payments were determined upon the basis of royalties from gas wells in the neighboring territory. This contract did not pertain to development of oil interests. It is claimed the McPherson as well as the Shell was liable to appellants by reason of contractual relations between the Shell and the McPherson.

The two oil-bearing formations which appellants contend should have been explored and developed are the shallower formation encountered at approximately 2,900 feet, known as the Mississippi limestone and referred to by the parties as the Chat formation. The second or deeper formation involved, and encountered at approximately 3,360 feet, is the Trenton limestone and it is spoken of by the parties as the Viola formation.

The instant action for failure to develop the oil interests was filed June 24, 1937. The specific items of damage alleged in the petition fall under two general headings. One item is for damages alleged by reason of failure to explore and develop the Chat formation, and the other was for alleged failure to develop and produce from the Viola formation. It was alleged the gas well drilled in 1931 on the north half of the 80 should have been deepened in the Chat not later than October 1, 1933, by 19 feet, and converted into a combination oil and gas well, and that by failure to do so plaintiffs were damaged between October 1, 1933, and the filing of this suit, June 24, 1937, in the sum of $3,750. That damage was based upon the allegation

that the well, if so deepened and operated, would have produced, between the dates stated, 30,000 barrels of oil of the market value of $30,000. It was alleged careful and prudent operation also required the drilling of one additional Chat well on the 80 between October 1, 1933, and December 1, 1933, and that such a well, if drilled and operated, would have produced by August 1, 1935, not less than 60,000 barrels of 36 or 37 degree gravity oil. It was alleged the market price was one dollar per barrel and plaintiffs' royalty would have amounted to $7,500. It was also alleged, if that well had been so drilled and operated it would have protected and preserved the oil in the Chat sand so that the Chat would have continued to produce oil indefinitely thereafter, and that failure to drill the additional well in the Chat had substantially reduced the possible recovery of oil from that sand.

The other specific item of damage was alleged to have resulted from failure to reasonably explore and develop the Viola formation. The averment was that diligent operation required the drilling of four wells in that sand to the approximate depth of 3,375 feet between June 1, 1934, and August 1, 1935, and if such wells had been so drilled defendants could have produced and marketed not less than 210,565 barrels of similar gravity oil as that produced from the Viola formation on adjacent and surrounding lands. It was alleged plaintiff's royalty from those four wells to August 1, 1935, would have amounted to $26,320, and that such drilling would have preserved the oil in that stratum in profitable quantities for an indefinite period after August 1, 1935, and that failure to drill the four wells had substantially reduced the possible recovery of oil from that stratum in the future.

The parties stipulated touching the following facts:

1. Change of name of defendant Shell.

2. Maps of the vicinity, marked exhibits "A" and "B," correctly show the location of wells drilled for oil or gas in the Chat and Viola formations as to January 1, 1939. All other data shown on the maps relative to the various wells is deemed to be correct for the purpose of this suit.

3. Exhibit "C," consisting of three pages, shows the total production as of January 1, 1939, of wells drilled in the field generally. It covered 39 Chat wells and 65 Viola wells.

4. Exhibit "D" contained the logs of all oil and gas wells in the entire field.

5. The average rock pressure of all gas wells drilled to the *Chat* in the areas shown by exhibits "A" and "B," on the dates shown, was as follows:

| | |
|---|---:|
| Original pressure | 1,025 lbs. |
| February, 1932 | 825 lbs. |
| February, 1933 | 735 lbs. |
| July, 1934 | 665 lbs. |
| July, 1935 | 560 lbs. |
| July, 1936 | 430 lbs. |

6. The area in the vicinity of land described in plaintiffs' petition was core-drilled by the Shell in 1925 and 1926. A contour map drawn according to the information obtained from such core drilling would be substantially the same as a contour map drawn on the top of the Chat, based on information from wells now drilled in that area.

7. The oil, if produced from the Myers 80 as plaintiffs claim it could have been produced, would have been sold for one dollar per barrel, whether produced from the Chat or Viola.

8 and 9. The cost of drilling and equipping a well to the Chat was $25,000, and to the Viola $35,000, during the years 1932 to 1935, both inclusive.

10. The expense of operating an oil well in either the Chat or Viola was $325 per month.

11. The salvage value of material in a well drilled to the Chat was $3,000, and $3,500 for a well drilled to the Viola.

12. Additional evidence may be introduced which is not inconsistent with the stipulated facts.

13. The stipulation is limited to the trial of this or any subsequent case involving the same controversy.

We shall first consider the case against the Shell. If it is liable upon any theory on any specific item of damage alleged we shall next consider the liability of the McPherson. On the other hand, if the Shell is not liable, it is not contended the McPherson is liable.

We shall first consider the item of damage pertaining to the Viola formation. Did the court err in sustaining the demurrer to appellants' evidence insofar as failure to explore and develop that formation was concerned? The first element of appellants' cause of action was the establishment of the breach of the implied covenant to explore and develop that formation. The second element they were required to reasonably establish was the extent of their damage. What about the proof touching the first element?

The petition alleged four wells should have been drilled in the Viola between June 1, 1934, and August 1, 1935, and that failure to drill them between those dates resulted in damage to appellants in the sum of $26,320.

The parties stipulated that the data contained on maps, exhibits "A" and "B," correctly reflected certain facts pertaining respectively to wells drilled in the Chat and Viola formations. The data covered the location of wells, date completed, the subsea depth of each well to the top of the producing horizon, the number of feet each formation was penetrated, the initial and maximum production of each well, the total recovery of barrels of oil, the number of months they produced, the date water was first encountered, if encountered, the wells which were initially and currently water free, the percentage of current water where initially free from water, percentages of initial and current water in each well, wells formerly drilled to the Viola and plugged back to the Chat formation, producing wells, dry holes, the location and number of gas wells in the entire field, and wells which originally produced and were later plugged back to the Chat formation or abandoned. Facts touching these subjects were thus admitted, in addition to the specific facts embraced in the stipulation formerly mentioned.

Appellants' experts estimated the total production from the four Viola wells, if drilled, would have been 260,000 barrels of oil. They allocated 65,000 barrels of oil to each of the four wells. They claimed that in arriving at their estimate they considered all stipulated facts, together with the location of the four wells on the structure, gas pressure, porosity and permeability of the formation as reflected by the general production in the entire field, and all factors which are generally regarded by practical operators as accepted methods for determining the amount of recoverable oil. In ruling on the demurrer those facts must be accepted as true.

According to the record, wells in the Viola were drilled on ten-acre locations and not closer than 330 feet from the property line. By June 1, 1934, no wells had been drilled in the Viola on the Myers 80, the land in question, and no wells had been drilled sufficiently near it to require an offset on the Myers 80. The nearest producing Viola well, as early as June, 1934, was located in the southwest corner of the eighty to the west of the Myers 80. It was drilled in June, 1934. It was approximately 1,320 feet west of the location on the Myers 80 where appellants insist one of the four Viola wells should

have been drilled. Altogether four Viola wells were drilled on the eighty west of the Myers 80. Another of those four wells was drilled in the center and along the west line of that eighty in January, 1935. The two other Viola wells on that eighty were drilled along its north line. One of those wells was drilled in the northwest corner of that eighty and as an offset to a well across the north line and as an offset to a well across the line diagonally to the northwest. The two north wells were drilled in October, 1934, and in February, 1935. The other one of those two north wells was drilled in the northeast quarter of that eighty and as an offset to a Viola well across the north line. It will be observed the last of these four wells was located so as to ordinarily require an offset in the northwest corner of the Myers 80. A Viola well had also been drilled in April, 1935, at a point one location east of the center of the Myers 80. It thus appears two offset wells ordinarily would have been required on the Myers 80. The Shell, appellee, insists, according to the stipulated facts and the testimony of appellants' own expert witness, a loss was sustained on the Viola well to the east of the Myers 80 of approximately $16,000, and that a loss of between $25,000 and $30,000 was sustained on the well drilled in the northeast corner of the eighty to the west of the Myers 80. Appellee also insists that, according to the stipulated facts, it sustained a loss on the well drilled across the line northwest of the northwest corner of the Myers 80 of approximately $30,000 to $35,000.

We need not determine whether those are the exact amounts of loss the Shell sustained on those respective Viola wells it had drilled to the northwest, west and east of the Myers 80. At least two of those wells were the nearest Viola wells to the Myers 80 at any time. They constituted the best evidence of which the subject, namely, the alleged breach of implied convenant to explore and develop the Viola formation on the Myers 80, was susceptible. We are persuaded, in view of the record, the trial court correctly ruled the evidence was insufficient to warrant submitting to the jury the question of breach of the implied covenant to explore and develop, so far as the Viola formation was concerned. The opinion testimony of experts to the contrary—if indeed it was contrary—cannot prevail against the stipulated facts. This is especially true in view of the express provision contained in the stipulation which makes it impossible to consider any evidence which is not consistent with the stipulated facts. No implied duty rests upon a lessee to offset a

nonpaying well, where the offset probably would result in a loss to the lessee. (2 Summers on Oil & Gas, 342, § 399; *Eastern Oil Co. v. Beatty,* 71 Okla. 275, 279, 177 Pac. 104; *Brewster v. Lanyon Zinc Co.,* 140 Fed. 801, 814; *Pelham Petroleum Co. v. North,* 78 Okla. 39, 44, 188 Pac. 1069; *Franklin v. Wigton,* 132 Okla. 236, 237, 270 Pac. 1; *State Line Oil & Gas Co. v. Thomas,* [Tex. Civ. App.] 35 S. W. 2d 746.)

It may also be well to observe that the combined production from the four Viola wells on the entire eighty-acre tract to the west of the Myers 80 was not sufficient to justify a finding the Shell had breached the implied covenant to explore or develop the Viola on the Myers 80. The production from those four wells, if averaged, might possibly show a slight profit, although that is doubtful. At any rate the evidence certainly did not disclose a breach of duty to diligently or prudently explore and develop the Viola formation under the Myers 80. The evidence also disclosed if four Viola wells had been drilled on the Myers 80 at locations indicated by appellants' witnesses, that such wells probably would have reduced to some extent the production from the four Viola wells on the eighty to the west of the Myers 80. Furthermore, the evidence discloses that two Viola wells on the south of the Myers 80, if they in fact had resulted in commercial wells, would have required offsets across the south line of the Myers 80 and offsets to the southeast and east of the Myers 80, which also probably would have reduced to some extent the production from the south wells on the Myers 80.

While we have thus far considered only the wells which formed the best basis for determining the question of breach of implied covenant, it may be well to note that other evidence considered in connection with evidence already discussed did not establish the contention the Myers 80 was located in the center of proven commercial production in the Viola structure. The Myers 80 is the east 80 of the northeast quarter of section 14. The oil development of this entire field was principally to the southwest, west and northwest of the Myers 80, although there was also some Viola development to the south and southeast, and two wells on the quarter section to the east of the Myers 80. The nearest Viola wells directly south of the Myers 80 were located at the extreme southern line of section 14. The nearest wells to the southwest of the extreme southwest corner of the Myers 80 were one location removed from the west line of the southeast quarter of section 14. The nearest

Viola well to the southeast of the southeast corner of the Myers 80 was located in the northeast corner of the quarter section which lay southeast of the Myers 80. The latter well was drilled by other lease owners in April, 1932. Only one producing well to the east of the Myers 80, other than the nonprofitable well previously mentioned, had been drilled, and it was located in the southeast corner of the quarter section east of the Myers 80. It was drilled in 1932. There were no Viola wells directly north of the Myers 80 and there were no Viola wells in the quarter section to the northeast of it.

Where the object of the lease is production—and it ordinarily is—neither the lessor nor the lessee, in the absence of stipulation, is the sole arbiter of what constitutes diligent exploration or development. (*Indiana Oil, Gas & Development Co. v. McCrory et al.*, 42 Okla. 136, 140 Pac. 610; *Empire Oil & Refining Co. v. Hoyt*, 112 F. 2d 356.)

A lessee or assignee of an oil and gas lease, under the implied covenant to diligently develop the property, is required to do what is reasonably expected of operators of ordinary prudence under the same or similar circumstances. (*T. P. Coal & Oil Co. v. Barker et al.*, 117 Tex. 418, 6 S. W. 2d 1031; *Indiana Oil, Gas & Development Co. v. McCrory et al.*, 42 Okla. 136, 140 Pac. 610; *Stanolind Oil & Gas Co. v. Kimmel*, 68 F. 2d 520; *Empire Oil & Refining Co. v. Hoyt*, 112 F. 2d 356; *Hartman Ranch Co. v. Associated Oil Co.*, 10 Cal. 2d 232.) That, of course, means what a reasonably prudent operator would have done under the circumstances existing at the particular period of the alleged breach and not what hindsight indicates he possibly might have done.

The large expense incident to exploration and development, combined with the fact the lessee, and not the lessor, must bear the loss of unsuccessful exploration and development, justifies the lessee in proceeding with reasonable caution and with a proper regard to his own interests, as well as those of the lessor. A lessee is under no implied duty to engage in an undertaking which is unprofitable to him, although it might, or would, result in some profit to the lessor. (*Stanolind Oil & Gas Co. v. Kimmel*, 68 F. 2d 520; *T. P. Coal & Oil Co. v. Barker et al.*, 117 Tex. 418, 6 S. W. 2d 1031, 60 A. L. R. 936; *Daughetee v. Ohio Oil Co.*, 263 Ill. 518; *Empire Oil & Refining Co. v. Hoyt*, supra; *Brewster v. Lanyon Zinc Co.*, 140 Fed. 801, 814; *State Line Oil & Gas Co. v. Thomas*, [Tex. Civ. App.] 35 S. W. 2d 746; *Franklin v. Wigton*, 132 Okla. 236, 237, 270 Pac. 1; 2 Summers

Oil & Gas, 342, § 399.) It is only to the end of mutual benefit or profit to both lessor and lessee that reasonable diligence is required. See cases last cited above and also *Greenwood v. Texas-Interstate P. L. Co.*, 143 Kan. 686, 690, 56 P. 2d 431, and cases therein cited; *Harris v. Morris Plan Co.*, 144 Kan. 501, 61 P. 2d 901. True, in *Harris v. Morris Plan Co.*, supra, a cancellation case, we held:

"The lessee is not warranted in not developing the leased real estate under the implied covenants of an oil and gas lease because it may not prove presently profitable to him, where there is a market for the oil and gas which may be produced and the production and sale thereof will be to the advantage of the lessor." (Syl. ¶ 3.)

Manifestly, if the lessee thinks an undeveloped portion of his lease cannot be developed with profit to him he may be required to surrender such portion of the lease. That is not the instant case. This is an action for damages for alleged breach of the implied covenant to explore, develop and produce. The evidence of appellants' own witnesses was that a lessee should not be required to operate a lease at a loss to himself. In substance the testimony was to the effect that where expense of exploration, development or production is large, the anticipated profit should be substantial. This fact is accepted in the industry by reason of the large risks taken. The best evidence failed to disclose exploration and development of the Viola formation on the Myers 80 would have been profitable to lessee. On the contrary, we think it fairly disclosed it probably would not have been profitable to the lessee. Since the breach of the implied covenant was not established as to the Viola formation, we obviously are not concerned with the second element of appellants' cause of action, namely, the extent of damage resulting from a breach of the covenant.

What about the damages touching the failure to explore, develop and produce from the Chat formation? This alleged damage falls under two headings. The first is that appellants were damaged in the sum of $3,750 by reason of failure to deepen the gas well further into the Chat by October 1, 1933. In other words, the contention is that diligent and prudent operation required that this gas well be converted into a combination oil and gas well, and that failure to so convert it resulted in the estimated damage between October 1, 1933, and the filing of this action in June, 1937.

The second item of damage in the sum of $7,500 is claimed by reason of failure to drill a second Chat well on the Myers 80 between October 1, 1933, and December 1, 1933. It is claimed rea-

sonable diligence required it. In other words, appellants contend the Shell did not discharge its duty under the implied covenant of the lease to explore and develop the lease for oil and gas by merely exploring and developing it for gas alone, and that reasonable diligence required the drilling of two oil wells in the Chat formation. Appellants demanded oil production on various occasions between August, 1932, and April or June of 1934. When they made demands on the Shell it notified them they should see the McPherson. When they saw the McPherson, it referred them to the Shell. In 1934 they were advised by the manager of the Shell that he had recommended development of the Myers 80 for oil a year and a half before, but that appellants' guess as to when they would get development was as good as his. Appellants' experts and practical operators testified if two Chat wells had been drilled they would have produced together 450,000 barrels of oil. Their testimony was that 290,000 barrels of that total production were irrevocably lost. The principal reason assigned for the loss was the subsequent decrease in fluid pressure. Appellants do not seek damages upon the theory of drainage by other wells. They assert there was some drainage but that they are not seeking recovery for any oil lost by drainage. Their theory and evidence was that, by reason of decrease in pressure, it was now impossible to recover some of the oil which remained in the formations. They testified this was true by reason of the fact that large flush production of oil from other wells in various parts of the field, large production of gas from the field generally, and waste of huge volumes of gas by popping-off processes in some parts of the field, and especially by other operators of gas wells to the southwest of the Myers 80, had materially reduced the necessary pressure for maximum production.

The parties stipulated the rock pressure in the Chat formation had been reduced from its original pressure of 1,025 pounds to 430 pounds in July, 1936. There was oral testimony that at the time of trial in 1939 the gas pressure had been reduced to 250 pounds. It is well to remember the Myers 80, here involved, was the east 80 of the northeast quarter of section 14. The Shell held all leases adjoining this 80, except the southwest quarter of section 14, and the quarter section to the southeast of the Myers 80. Appellants' evidence was further that appellees owned a sufficient percentage of the oil and gas leases in the entire field to enable them to determine the priority of development of oil and gas in the field. Appellants' testimony

was the field should have been developed for oil first for the following reasons: Oil was more valuable than gas; production of oil first conserves the gas pressure and helps force the oil from the zone into the well; when gas is removed first it leaves only water pressure underneath the oil, and water pressure works more slowly than gas pressure; to produce gas first changes the character of oil by making it thick and heavy; the thicker and heavier the oil becomes the greater is the tendency to adhere to formations and the more difficult it becomes to recover it; the removal of gas first causes salt water to penetrate the oil-bearing sands; it is economical to remove oil first; if oil is taken first the gas is not lost but may be produced later.

The subject field was discovered as a gas field in 1929. The early and extensive development of the field was for gas which had a ready market. The Myers 80 was early surrounded with gas wells. The instant field was not an ordinary oil field. It was what is described as a "gas capped" field. Gas covered the entire field and it was found in large volume in the sands nearest the surface. The oil formations were encountered next, and water, being heavier than oil, was underneath the oil formations.

Appellants' testimony was that the Shell had core-drilled the entire field in 1925, 1926, made thorough surveys of the formations according to accepted methods in the oil industry which revealed the Myers 80 was high and favorably located upon the structure, and that the Shell had reason to believe oil probably would be found in commercial quantities. The various factors and data which were stipulated to by the parties touching the Viola wells were likewise stipulated to as touching the Chat wells. Those factors and that data have been previously stated and need not be repeated here. Appellants' experts in substance testified these various factors and data upon which their testimony, concerning estimated production, was based, constituted accepted standards upon which the oil and gas industry made its estimates of probable production for all practical and financial purposes. Appellants insist that testimony was the best testimony of which the subject is susceptible and hence was sufficient. The question before us does not concern the competency of such testimony but rather whether, in view of the entire record, there is testimony to establish the breach of the implied covenant to explore and develop, and second, whether the evidence forms a

reasonable basis for the measurement of damages. Appellants contend it does, and appellees contend it does not.

In this connection we are, of course, also obliged to consider the stipulated facts. Before we do so, however, it will be necessary also to consider some evidence concerning which the parties did not stipulate. Appellants' experts concede porosity and permeability of oil-bearing sands constitute important factors in determining the uniformity of production in any oil field. They did not claim to know the exact porosity or permeability of the Chat formation. They frankly stated they nor any other person, in their opinion, knew definitely what the porosity or permeability of oil-bearing sands might be at every given point. They admitted it might vary in wells one location removed and from point to point in the same well. Speaking of the instant field generally, however, it was their opinion the porosity and permeability was fairly uniform. Appellees insist the stipulated facts, showing the initial and total production from various wells, and other essential factors, disclose the porosity and permeability of both the Viola and Chat formations varied tremendously.

Appellants' experts further testified that in determining the probable production from undeveloped leases a highly important factor was the ability to ascertain the trend of the structure. In order to discover the trend in the instant case they testified they had considered all the stipulated facts and all information known to the industry, and were of the opinion the trend definitely ran from the southwest to the northeast across the Myers 80, and that the Myers 80 was located favorably and high on the structure. They further testified the trend across the Myers 80 was likewise indicated by production running in a line from the southwest to the northeast.

Appellants' experts conceded that in arriving at their estimates of production under the Meyers 80 they considered all information available to them at the time of the trial in 1939, as well as information which they possessed in earlier years. One of appellants' expert witnesses, F. G. Holl, had made a survey for appellants in 1935 and in his report in 1936 gave it as his opinion that if the Myers 80 were explored profitable oil production would result. He also made estimates at that time as to the probable production from the wells, if drilled.

The damage as to the Chat formation was predicated upon the contention that formation should have been explored and developed for oil not later than October, 1933, and that if two wells had been drilled to a sufficient depth into the Chat by December 1, 1933, royalties would have accrued to appellants to the extent of $7,500 by June, 1937, the date the instant action was filed. We are therefore obliged to examine the stipulated facts concerning production from Chat wells between October, 1933, and December, 1933. In the years 1933, 1934 and 1935 there were no Chat wells to the north, northeast, east or in the quarter section to the southeast of the Myers 80. The nearest Chat well to the Myers gas well, located in the center of the north half of the Myers 80, was the Derby-Giffin well, which was located almost one-half mile to the northwest. It was located just across the north line of section fourteen, and was drilled in September, 1932. There was also a Chat well drilled in 1931 directly west of the south half of the Myers 80. It was, however, much farther removed from the Myers 80 than the Derby-Giffin well. There were four Chat wells located in the southwest quarter of section fourteen. They were drilled in 1932. No Chat wells were drilled on adjacent or nearby surrounding lands in 1933 except one well. It was drilled in December, 1933, and was located in the center of the south half of the west 80 of the southeast quarter of section 14.

In September of 1934 the nearest Chat well, up to that time, was drilled and it was located in the center of the north half of the 80 lying south of the Myers 80. The nearest Chat wells drilled in 1935 were located in the extreme southwest corner of the southeast quarter of section fourteen, and in the center and south half of the southwest quarter of section fourteen.

It was not until 1936 that Chat wells were drilled on the south half of the two eighties lying to the east and west of the Myers 80. Two wells were drilled in the quarter section to the east. One of those wells was drilled in January, 1936. It was located in the center of the south half of the 80 nearest to the Myers 80. The other of those two east wells was drilled in the center of the quarter section to the east. The Chat well to the west of the Myers 80 was drilled in November, 1936, and in the center of the south half of that 80. In December in 1936 appellees drilled a Chat well in the center of the south half of the Myers 80. It had an initial production of 635 barrels per day and a total production to January 1, 1939,

of 71,800 barrels. In February, 1939, appellees deepened the gas well on the Myers 80 ten feet in the Chat formation and it had an initial production of 305 barrels per day. That production of oil from this gas well was far in excess of the production which appellants' expert, Holl, had estimated the well would produce if it had been converted into a combination oil and gas well in 1933, before the gas pressure had been materially reduced. Appellees insist the oil production from this gas well in 1939 conclusively refutes appellants' contention they were damaged by the fact gas was produced first. Appellants counter with the contention their estimates of oil production from the gas well and from the other Chat well on the Myers 80 were too conservative, and that if their Chat wells had been drilled earlier they would have produced still larger quantities of oil. Appellants' expert, Holl, frankly conceded that in order for his theory of producing the gas first to be workable it would be necessary to operate the entire field as a unit. We have previously indicated what leases in the immediate surrounding territory the Shell did not own. Manifestly it could not compel other leaseholders to produce oil first or gas first from their leases. Much gas was produced and an enormous volume of gas was popped off on the lease covering the southwest quarter of section fourteen, which appellees did not own. It was conceded by expert testimony that the Shell, in order to protect its own gas supply on the Myers 80, was obliged to produce gas. In order to compensate appellants for gas which might be drained from the south half of the Myers 80, by operation of other gas wells, appellants received royalty payments in lieu of a gas well at that location.

Appellees remind us this is not an action to recover damages by reason of drainage and that at least in the years 1933, 1934 and 1935 no Chat well had been drilled sufficiently near to the Myers 80 to require an offset on the Myers 80. Appellees further insist the subject field was discovered as a gas field, they had a ready market for the gas, appellants received the revenue from one large gas well in the north and received $3,777.63 by October 1, 1936, as revenues in lieu of a gas well on the south half of the Myers 80, and that, in view of the stipulated facts, they did not breach the implied covenant to explore, develop and produce oil earlier from the Chat formations.

Appellees further contend that no damage was established by their failure to drill the Chat well prior to December, 1936, or by

their failure to deepen the gas well prior to February, 1939. They also contend that if they in fact breached the implied covenant to develop the Chat formation, and if any damage was established by such breach, the damage is too speculative to form a reasonable basis of measurement.

In the view taken by a majority of the court it is necessary to consider only appellees' last contention touching the Chat formation.

It would constitute an almost endless task to review all the testimony in detail, including comparisons of all factors pertaining to 39 Chat wells, which were drilled by January 1, 1939, nor is it deemed necessary to do so. The court has carefully reviewed the testimony touching the earlier deepening of the gas well. It has noted with much care the experiences and hazards encountered in converting other gas wells in the subject field into combination oil and gas wells. It has noted the revenues of those wells, for both oil and gas, as compared with the revenues from the Myers gas well. It has taken cognizance of the fact this field was discovered as a gas field and was first developed primarily as such, and the further fact that in later years it has been turning into an oil field. It has studiously examined the stipulated facts, including the various exhibits. We are not unmindful of the rule that the admission of expert testimony is for the court, and the weight thereof is for the jury. (*Baird v. Shaffer,* 101 Kan. 585, 168 Pac. 836; *Empire Oil & Refining Co. v. Hoyt,* 112 F. 2d 356.) It is necessary, however, that the facts upon which an expert relies for his opinion should afford a reasonably accurate basis for his conclusions as distinguished from mere guess or conjecture. (20 Am. Jur. [Evidence], § 795, and cases cited.) The writer does not mean to imply the opinions of the experts and practical operators were based entirely upon conjecture and speculation. In the instant case, however, by virtue of the terms of the stipulation, the opinions of experts or the testimony of any witness is not permitted to be inconsistent with the stipulated facts. The stipulated facts and other clear testimony, concerning production of various gas wells which were converted into combination oil and gas wells, give rise to great speculation touching the probable profit of such a venture. Where the facts upon which the opinion of an expert is based are highly speculative and conjectural, the jury would not be relieved from the necessity of reaching an arbitrary conclusion. The result is such expert testimony cannot be permitted to

form the basis of a verdict. (*Empire Oil & Refining Co. v. Hoyt*, 112 F. 2d 356.) We have repeatedly held a verdict resting upon highly speculative testimony cannot stand. The rule has been applied in a great variety of damage cases, including a damage action by a lessor against a lessee for loss of oil alleged to have been drained from the land of the lessor. (*Railroad Co. v. Aderhold*, 58 Kan. 293, 298, 49 Pac. 83; *Railway Co. v. Posten*, 59 Kan. 449, 53 Pac. 465; *States v. Durkin*, 65 Kan. 101, 68 Pac. 1091; *Maxwell v. Coffeyville Mining & Gas Co.*, 68 Kan. 821, 822, 75 Pac. 1047; *Duncan v. Railway Co.*, 86 Kan. 112, 119 Pac. 356; *Patterson v. Oil Co.*, 107 Kan. 221, 191 Pac. 258; *Beeler v. Railway Co.*, 107 Kan. 522, 192 Pac. 741; *Altman v. Miller*, 128 Kan. 120, 276 Pac. 289; *Fair v. Golden Rule Refining Co.*, 134 Kan. 623, 7 P. 2d 70; *Labette Petroleum Co. v. Cities Service Gas Co.*, 137 Kan. 75, 19 P. 2d 470; *Hendren v. Snyder*, 143 Kan. 34, 53 P. 2d 472; *Corr v. Continental Oil Co.*, 145 Kan. 78, 64 P. 2d 30; on rehearing, 147 Kan. 1, 75 P. 2d 212 (oil drainage case); *Hogan v. Santa Fe Trail Transportation Co.*, 148 Kan. 720, 727, 85 P. 2d 28; *Brothers v. Adams*, 152 Kan. 675, 107 P. 2d 757.) These are only a few of the cases in which the doctrine against speculative damages, as to cause of injury or extent of injury, has been applied.

The same difficulty is encountered with regard to measurement of damages claimed for failure to drill the other Chat well. We are not unmindful of the expert testimony touching the general uniformity of porosity and permeability of the oil-bearing formations in this field. There was also testimony these factors varied considerably in the Chat formation. On demurrer, however, we are required to consider only testimony favorable to the party adducing it, and that is what we shall do. When, however, we turn to the stipulated facts, by which we are bound, we find various wells in the Chat formation similarly situated on the structure, only one location removed from each other, and drilled at the same or at approximately the same time, in which the production varies to a marked degree. Here the nearest Chat well in October, 1933, was practically one-half mile removed from the Myers 80 gas well, and much farther removed from the location of another Chat well which appellants thought should have been drilled. Numerous cases are cited by appellants from other jurisdictions, but we find none in which damages were allowed where the well, or wells, used as a basis for measurement were more than one location removed. We

do not mean to say we would under no circumstances allow damages where the well or wells used as a basis for determining damages were more than one location removed. We do think the stipulated facts in the instant case, by which all parties are bound, compel the conclusion that a verdict based upon the evidence in this case would be too speculative to form a safe basis for measurement of damages. For a few of the decisions in which damages in oil and gas cases were not allowed by reason of the speculative character of the extent of the damage see, also, *Indiana Oil, Gas & Development Co. v. McCrory et al.*, 42 Okla. 136, 140 Pac. 610; *Steel v. Development Co.*, 80 W. Va. 206, 92 S. E. 410; *Henderson Company v. Murphy*, 189 Ark. 87, 70 S. W. 2d 1036; *State Line Oil & Gas Co. v. Thomas*, 35 S. W. 2d 746, (Tex. Civ. App.) ; *Jennings v. Carbon Co.*, 73 W. Va. 215, 223, 224, 80 S. E. 368; *Central Ky. Natural Gas Co. v. Williams*, (C. of A. Ky.) 249 Ky. 242, 60 S. W. 2d 580.

We think the demurrer of appellee, Shell, to appellants' evidence was properly sustained. It is therefore unnecessary to determine the effect of the contractural relationship between the Shell and the McPherson companies.

The ruling of the trial court is affirmed.

HARVEY, J. (concurring specially) : I agree with the opinion as written, but would go further and hold there is no substantial evidence that defendants breached the implied covenants of the lease with respect to reasonable development for oil, either in the Viola or the Chat formation.

WEDELL, J. (concurring in part and dissenting in part) : I concur in the majority opinion touching the two items of damage which pertain to exploration and development of the Viola formation and to the conversion of the gas well into a combination oil and gas well. I do not agree with the majority opinion touching exploration and development of the Chat formation.

Before discussing the latter question I desire to state briefly my personal views relative to the alleged failure to convert the gas well into a combination oil and gas well. Accurately speaking, it seems to me the subject of converting the gas well did not really involve the question of breach of the implied covenant to explore and develop but rather a question of the proper method or manner of development where one of the minerals for which the lease was

executed had been discovered. In such a situation the real question was how a reasonably prudent operator would have proceeded with development under the same or similar circumstances at that time. (*Empire Oil & Refining Co. v. Hoyt,* 112 F. 2d 356, 360.) While appellants' witnesses testified reasonably prudent operation required the deepening of that well and its conversion into a combination well, the facts upon which their testimony was based were too speculative, uncertain and conjectural. The evidence was therefore too speculative as to the cause of damage. While my approach to this particular item of damage may vary somewhat from that of the majority, the result is the same.

Does it, however, follow appellants' evidence was insufficient to take the case to the jury on the question of otherwise exploring and developing the Chat formation than by a combination well? I do not think so.

It was appellants' contention a separate and distinct Chat well should have been drilled for exploration purposes not later than October 1, 1933. The lease was not given only for its exploration and development as a gas property. It was also given for the purpose of obtaining its exploration and development as an oil property. In my opinion, it will not do to say the lease was fully developed for · gas and the landowners were receiving substantial profits from the gas. That was one of their contractual rights, but it was not their only right. Lessors were also entitled to have the lease explored for oil. (*Webb v. Croft,* 120 Kan. 654, 658, 244 Pac. 1033.)

I cannot agree with appellees that no implied covenant exists to explore and that an implied covenant exists only to prevent drainage by drilling offset wells and to reasonably develop the lease after commercial production is obtained on some part of it. The first implied covenant by which a lessee is bound is the duty to explore. The second implied covenant is to reasonably develop the lease in the event exploration proves successful. (*Collins v. Oil & Gas Co.,* 85 Kan. 483, 486, 118 Pac. 54; *Ray v. Brush,* 112 Kan. 110, 210 Pac. 660; *Powell v. Danciger Oil & Refining Co. of Texas,* [Tex. Civ. App.] 134 S. W. 2d 493, 497; *Baird's Appeal,* 334 Pa. 410, 6 Atl. 2d 306, affirming 132 Pa. Sup. Ct. 573.) Obviously, there could be no development unless exploration or discovery preceded. If there was no duty to explore for oil, a lessee could hold the oil rights forever without exploring the productivity of oil-bearing sands simply because he had developed the lease for gas. That cannot be and, in my

opinion, is not the law. This statement, however, must not be construed as necessarily being contrary to the majority opinion. My statement concerning the implied covenant to explore for oil goes to the cause of damage, and the majority opinion, as to Chat formation, is based upon the speculative extent, or measure, of damage. It is my opinion there existed, under the evidence, a duty to more seasonably explore for oil, under the implied covenant, especially in view of the demand for such earlier exploration.

The basic, primary, or five-year term of the leases expired in 1931 and 1932. In 1932 the landowners began making demand upon both appellees for exploration and development of the lease for oil. They continued such demands during 1933 and 1934. The manager of the Shell in 1934 finally advised that a year and a half previously he had recommended the development of the Meyers 80 for oil. That evidence was of some value, as the evidence of one engaged in the business, as to whether the lease could be developed profitably for oil. (*Wheeland v. Gas Co.*, 92 Kan. 50, 51, 139 Pac. 1010.) Appellants were informed their guess as to when the lease would be developed for oil was as good as his.

Ordinarily, appellants, under such circumstances, had the option of seeking cancellation of the lease, at least as to the oil rights, or to allow the lease to stand and sue for damages for breach of the implied covenant to explore and develop for oil. (*Julian Petroleum Corporation v. Courtney Petroleum Co.*, 22 F. 2d 360, and cases therein cited.) Appellants chose the latter course. That was their privilege.

No Chat well was drilled on their land until December, 1936. When finally drilled it proved to be a commercial well with large initial and accumulated production. The large production from this Chat well more than confirmed the previous estimated production by appellant's expert, Holl. This subsequent event tended to disclose his opinion was not based upon mere speculation or conjecture. Events which occur after the wrong complained of may, and frequently do, serve to render the damages sufficiently certain. (15 Am. Jur., Damages, § 23.) In view of the entire record I do not believe we are fairly justified in saying the opinion of the experts was based on hindsight so far as the Chat was concerned. The expert, Holl, stated that even the Shell had little information concerning the Chat formation in 1935 that it did not have in 1933.

Appellees insist appellants are not suing for damages due to

drainage. That is true. The implication of appellees' contention is that the oil therefore remains under appellants' land and that they have not been damaged. With that contention I cannot agree. It is no defense in a damage action for failure to explore and produce oil at an earlier date, that the oil remains in the oil formations. In the first place the evidence in fact was that some of the oil had been drained, although appellants are not suing for that damage. Their evidence, however, was further that only a portion of what oil remained, after drainage, could now be recovered. It was for the latter loss that they sought to be compensated. But if all the oil in fact remained under the land and actually could be recovered later, that fact would constitute no defense to the instant action for damages, based upon failure to produce the oil at the time it should have been produced by prudent exploration and development. The owners of the land were entitled to have the benefit of the oil at the time the wells should have been drilled and not at some remote period in the future. (*Mills v. Hartz,* 77 Kan. 218, 220, 221, 94 Pac. 142; *Daughetee v. Ohio Oil Co.,* 263 Ill. 518, 527, 105 N. E. 308.) Appellants were entitled to one-eighth of the oil produced. The damage for failure to develop and produce, under such a lease, is the value of the royalty lessor would have obtained. The damage is not limited to the interest on such value. (*T. P. Coal & Oil Co. v. Barker et al.,* 117 Tex. 418, 6 S. W. 2d 1031.)

The evidence was sufficient to raise an issuable fact relative to the cause of damage, namely, the breach of the implied covenant to explore and develop. Issuable facts are for the determination of the jury. Appellants' experts and practical operators testified the Chat formation on the Myers 80 was not explored and developed in accordance with the diligence exercised by reasonably prudent operators. They testified their opinions were based upon the stipulated facts. On demurrer that testimony must be accepted as true. It should be noted we do not have evidence here that production from the Chat would have been unprofitable or probably unprofitable, as the record disclosed concerning the Viola formation. The opinion evidence of experts and practical operators was that production in the Chat would have been profitable.

It is not claimed appellants' witnesses were not qualified as experts and practical operators in the oil and gas industry, and indeed they were qualified. It is well established that qualified experts in the oil and gas industry, while not able to determine production with

absolute certainty, are able to furnish reasonably accurate estimates of what a certain territory will produce, estimating from producing wells in the locality, and that such testimony will support a verdict for damages. (*Wheeland v. Gas Co.*, 92 Kan. 50, 139 Pac. 1010.) That is the kind of testimony appellants introduced in the instant case as to the Chat formation. It is only where such damages do not afford an adequate remedy for failure to develop that courts give redress by means of the more drastic remedy of forfeiture. (*Howerton v. Gas Co.*, 82 Kan. 367, 108 Pac. 813; *Wheeland v. Gas Co.*, supra.)

Since there was competent evidence the lease owner had breached the implied covenant to explore and develop the Chat formation, the only remaining question is the extent of the damage resulting from the breach. The modern tendency is not to deny recovery where the cause of damage is established and uncertainty remains only as to the exact extent of the damage. (17 C. J. 756, § 90; 15 Am. Jur., Damages, § 23; 1 Thornton's Law of Oil and Gas, 4th ed., p. 325; Annot. 36 A. L. R. 1408.) My own views on this aspect of the law are disclosed by cases cited in the dissenting opinion in *Hogan v. Santa Fe Trail Transportation Co.*, 148 Kan. 720, 85 P. 2d 28, in which action the principle involving extent, or measure, of damages was involved.

Was the evidence as to the extent, or measure, of damage, however, too speculative in the instant case? In my opinion it was not, in view of the particular circumstances in the instant case. The Shell had acquired all the oil and gas leases adjacent to or immediately surrounding the eighty acres in question, except the southwest quarter of the section in which the Myers 80 was located and the quarter section which touched the Myers 80 to the southeast. It therefore had the right to determine the locations at which oil wells could and would be drilled adjacent to the Myers 80. Whether the McPherson also had some rights in that respect I need not decide in view of the majority opinion. At any rate the Shell was not relieved so far as its duties and obligations to appellants were concerned by reason of any contractural relations it may have had with the McPherson. The Shell chose not to drill wells earlier in the Chat formation at locations which required offsets on the Myers 80. It chose not to drill any oil wells on the Myers 80. Had there been any exploration of the Chat formation earlier on the Myers 80, as the evidence disclosed there should have been, there might have ex-

isted a more definitely proven basis for estimating the damage resulting from their failure to fully develop the Chat formation of the Myers 80. Appellants were not responsible for the fact that a more accurate basis for measurement of damages did not exist. The lessee was responsible for that fact. A party who breaches a contract cannot escape liability for his own wrong by reason of lack of a more perfect measure of damages where he is responsible for the inadequate means of measuring the damage. (*Hoffer Oil Corporation v. Carpenter*, 34 F. 2d 589; *Stanolind Oil & Gas Co. v. Kimmel*, 68 F. 2d 520.) It seems to me this principle is particularly applicable to the oil industry in which a certain amount of speculation inheres in the very nature of the industry. The parties to such contracts are charged with knowledge of their uncertainties and are held to have contracted with reference to their uncertain and speculative character. (*Hoffer Oil Corporation v. Carpenter* and *Stanolind Oil & Gas Co. v. Kimmel*, supra.)

The fact damages are difficult of measurement with mathematical certainty, or are not as exact as courts might wish for, is no defense in an action for damages for failure to reasonably develop a lease. The best evidence of which the subject is susceptible is frequently the opinion of experts and practical operators in the oil industry, and such evidence has been held sufficient in a great variety of oil and gas cases. (1 Thornton's Law of Oil and Gas, 4th ed., p. 332, § 116, p. 357, § 122b; *Daughetee v. Ohio Oil Co.*, 263 Ill. 518, 525, 526; *Hartman Ranch Co. v. Associated Oil Co.*, 10 Cal. 2d 232, 72 P. 2d 1163; *T. P. Coal & Oil Co. v. Barker et al.*, 117 Tex. 418, 6 S. W. 2d 1031; *Ross v. Damm*, 278 Mich. 388, 270 N. W. 722; *Julian Petroleum Corporation v. Courtney Petroleum Co.*, 22 F. 2d 360, 362, 363; *Stanolind Oil & Gas Co. v. Kimmel*, 68 F. 2d 520, 522, 523.) For general rule see, also, 15 Am. Jur., Damages, § 23, and *City of Kennett v. Construction Co.*, 273 Mo. 279, 202 S. W. 558.

Insofar as my own views are concerned, it may be conceded that in the cases last above cited some, or all, of the wells used as a basis for estimating the damages involved may have been closer than the producing Chat wells were to the Myers 80 on October 1, 1933. That fact would not, in my opinion, alter the rule that the evidence of experts and practical operators, the best evidence available, was sufficient, where the lessee is responsible for the lack of a more perfect measure of damages. The testimony of appellants'

witnesses, including the purported statement of the manager of the Shell in 1934, which we must at this stage accept as true, and the further fact that a large commercial well was discovered in 1936 in the Chat formation of the Myers 80 convinces me the evidence was sufficient to raise factual issues on both the element of breach of covenant and the element of the extent, or measure, of damages insofar as the Chat formation was concerned.

There are some other aspects of this case I should like to discuss, but limitation of time forbids. I think the demurrer was properly sustained as to items of damage previously indicated and improperly sustained as to the item of damage pertaining to failure to more seasonably explore the Chat formation for oil.

ALLEN and HOCH, JJ., concur in the dissent.